[No. B070099. Second Dist., Div. Five. July 16, 1993.]

COUNTY SANITATION DISTRICT NO. 8 OF LOS ANGELES COUNTY, Plaintiff and Respondent, v.
WATSON LAND COMPANY, Defendant and Appellant.

**COUNSEL**

Demetriou, Del Guercio, Springer & Mayer, Jeffrey Z. B. Springer and Kermit D. Marsh for Defendant and Appellant.

Knapp, Marsh, Jones & Doran, Wesley G. Beverlin and Patricia M. Schnegg for Plaintiff and Respondent.

**OPINION**

**GRIGNON, Acting P. J.**—Defendant and appellant Watson Land Company (Watson) appeals from a judgment in this eminent domain action brought by plaintiff and respondent Los Angeles County Sanitation District No. 8 (the District). Watson contends that the trial court erred in granting the District's

motions *in limine* excluding testimony of Watson's expert regarding the value of the easements condemned by the District and in denying Watson's request for a continuance to obtain admissible expert testimony on valuation. We affirm.

### FACTS AND PROCEDURAL BACKGROUND

The District is a public entity with the power of eminent domain. On February 20, 1990, the District filed a complaint in eminent domain against Watson. The District sought to condemn permanent subterranean sewer easements on two properties owned by Watson and temporary construction and occupational rights of way on the same properties. The properties are located in the City of Carson and are currently used as parking lots and storage yards by Watson's tenants, K-mart and Northrop. The properties are referred to as the "K-mart property" and the "Northrop property."

The District also filed a summary of appraisals of the properties. Paul MacMillan, an MAI (member, Appraisal Institute) appraiser, valued the K-Mart property easement at $70,000 and severance damages at $0, as of October 17, 1989. He valued the Northrop property easement at $50,000 and severance damages at $0, as of the same date.

The District applied for and received an order for immediate possession of the K-Mart property on February 20, 1990, effective March 1, 1990.[1]

The "right to take" phase of the trial was set for March 5, 1990. On March 13, 1990, the trial court issued its statement of decision finding that the District's resolution of necessity was valid and the taking by the District was necessary and valid. The trial court found that the District's major sewer out-fall line was likely to fail and District staff had undertaken the study and design of a new replacement out-fall line which would take over the sewer flow, and permit restoration of the existing sewer line. Beginning in 1987, District officials met with representatives of Watson to arrange for easements over Watson's properties. Negotiations broke down in December 1989, when Watson demanded compensation of $643,000. The District had offered $120,000 and had already expended $500,000 on the project. The trial court termed this an "ambush tactic" and rejected Watson's contention that the District had not observed the proper procedures in proceeding with its condemnation action.

On June 8, 1990, the trial court entered an order granting the District the immediate possession of the Northrop property, effective June 18, 1990. By

---

[1]Watson's motion to stay the order for possession was denied on February 28, 1990.

the time of the date set for the valuation phase of the trial, the District had constructed within each of the proposed 20-foot wide easements, 2 large concrete box structures for the sewer project, having a cross-section of 12 feet by 14 feet. Seven surface penetrations were made on the Northrop property, three of which were within the easement area. These included manhole covers and large concrete doors. As part of the permanent easement, the District sought surface access rights to the easement.

A joint status conference was held on October 1, 1990. The valuation phase of the trial was set for March 4, 1991, with a final pretrial conference set for January 3, 1991. Watson and the District agreed to exchange final valuation data on that date. After these dates were apparently continued, on March 12, 1991, Watson lodged an appraisal report prepared by its expert Michael Genewick.

The final pretrial conference was held on March 14, 1991, and the exchange of valuation data was made. Trial was set on that date for May 22, 1991, subject to resetting. Watson was ordered to provide to the District a supplemental appraisal report regarding whether any compensation should be paid for the temporary easement. The District was ordered to provide Watson with a supplement to its appraisal indicating "breakdown of areas of part taken and temporary easement areas," as well as comparable sales.

A mandatory settlement conference was held on December 12, 1991, and the District served its final offer of compensation of $180,000. Trial was set for June 15, 1992. A joint issues conference was set for June 8, 1992. The minute order required the parties to file and serve a joint issues statement by June 5, 1992. A joint final status conference statement was filed on June 8, 1992, which stated that Watson would call Genewick as its valuation expert and the District would call MacMillan as its valuation expert. The final status conference was held on that same day and the trial court issued orders setting the matter for a jury trial on June 15, 1992, and reciting that expert witness information had been exchanged and depositions taken. In addition, the order notes that certain unspecified motions *in limine* remain to be adjudicated prior to the commencement of the jury trial.

*The Genewick Appraisal*

The Genewick appraisal notes that both the K-Mart and Northrop properties are located in the Watson Industrial Center, a master-planned industrial park, and are currently used for light manufacturing and warehouse distribution "which is presently the highest and best use." However, the report notes that the trend in the local area is toward research and development and

low-rise garden office buildings. The market value of the easements was reported as $496,787. "The market value of the subject easements [was] based on six (6) comparable license agreements between Watson Land Company and Dominguez Properties and Union Carbide Industrial Gases, Inc. and Texaco Trading and Transportation, Inc." Where the licenses were permanent in nature, such as for a permanent street or railroad easement, a 50 percent encumbrance factor was used. Genewick assumed a 50 percent encumbrance factor for the K-Mart and Northrop easements as well.

The license agreements were based upon a price per square foot for the area of the easement. In every case, the price per square foot was $1.40, but in some cases was reduced by the "encumbrance factor" of 50 percent to yield a $0.70 per square foot price. The licenses were adjusted for inflation every 12 months. Apparently, none of the licenses were located on either the K-Mart or Northrop properties.

In computing the value of the proposed taking, Genewick assumed a value for the easement of $1.40 per square foot, with a 6 percent annual adjustment for inflation. He further assumed that the encumbrance factor would be 100 percent for the first four months and 50 percent thereafter. This income stream was discounted for present value using a 10 percent discount rate. The net present value of the permanent easement was apportioned equally between the areas taken and the portion of the K-Mart and Northrop lots not taken.

## The Motions in Limine

On June 16, 1992, the District made three separate motions *in limine* to exclude the testimony of Genewick. First, the District contended that Genewick, an employee of Watson, was not qualified as an appraiser. In addition, the District argued that Genewick did not follow the legally required valuation formula for appraising subterranean easements. Finally, the District contended that Genewick did not follow the legally required formula for valuing severance damages. The District presented deposition testimony from Genewick demonstrating that he had relied upon six pipeline right-of-way licenses by Watson to other parties to determine the fair market value of the easements sought by the District. The District contended that this evidence was inadmissible. The trial court granted the latter two motions, adding that the first motion regarding Genewick's qualifications was moot.

## The Request for Continuance

Watson then moved for a continuance to obtain an expert witness opinion which would comply with the trial court's rulings. The motion was denied.

The trial court observed, "Well, I'm going to deny that request. I think you've indicated to me earlier that there are cases that state that he should be given that continuance. And I'm sure that you could cite those cases to me if I gave you a few minutes, and were given time to call your office in order to do a little research on your own.

"However, these cases are sent out to me for trial, and I don't know how long—I don't have the dates here—how long this case has been in the system but, again, I think for the record that both of the attorneys are very experienced attorneys in the field of eminent domain, and I think that it should have been clear to the attorneys for Watson Land Company that they would run into this problem with this expert.

"It seems to me they put all of their eggs in one basket, taking a chance that they wouldn't be able to get Mr. Genewick to testify in this matter, and then if he was not allowed[,] to make this motion for a continuance.

"The case has been sent here for trial, and that's what it's here for, is for trial. On that basis I'm going to deny the motion."

After the motion was denied, Watson's counsel objected for the first time that the "motion was not made in a time period provided under the local rules of court, and as a result [Watson has] not been permitted to rebut this evidence within the time parameters."

The parties stipulated to a valuation judgment in the amount of $120,000 to avoid a valuation trial while preserving Watson's right to appeal from the grant of the motions *in limine.* The stipulation was also without prejudice to the District's right to assert a lower valuation figure on remand following a successful appeal.

Judgment was entered on July 9, 1992, and this timely appeal followed.

### DISCUSSION

*Exclusion of Valuation Testimony*

In a condemnation proceeding, compensation for the fair market value of the property taken must be given.[2] (Cal. Const., art. I, § 19; Code Civ. Proc., § 1263.310.) In addition, compensation must be given for damage to the

---

[2]"(a) The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able

remainder. (Code Civ. Proc., § 1263.410.) Damage to the remainder can be caused either by severance of the property taken from the remainder or the construction of the project for which the property is taken, or both. (*Id.*, § 1263.420.)

■ The value of land is essentially a question of opinion to be established by expert testimony. (*Sooy* v. *Kunde* (1947) 80 Cal.App.2d 347 [181 P.2d 758].) Expert opinion testimony is limited to such opinions as are related to subjects so beyond common experience that the opinion of an expert would assist the trier of fact, and are based upon matter perceived by or personally known to the expert of a type reasonably relied upon by experts in formulating an opinion on such subject "unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.)

A trial court may, and upon objection must, exclude opinion testimony that is based in whole or in significant part on matter that is not a proper basis for such an opinion. (Evid. Code, § 803.) In that case, the witness may state his opinion after excluding from consideration the matter determined to be improper. (*Ibid.*) ■ "Under [Evidence Code section 801,] subdivision (b), the matter upon which an expert's opinion is based must meet each of three separate but related tests. *First*, the matter must be perceived by or personally known to the witness or must be made known to him at or before the hearing at which the opinion is expressed. . . . *Second*, and without regard to the means by which an expert familiarizes himself with the matter upon which his opinion is based, the matter relied upon by the expert in forming his opinion must be of a type that reasonably may be relied upon by experts in forming an opinion upon the subject to which his testimony relates. . . . *Third*, an expert may not base his opinion upon any matter that is declared by the constitutional, statutory, or decisional law of this State to be an improper basis for an opinion." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 801, pp. 390-391.) ■ Whether an opinion should be held inadmissible in a particular case depends upon the extent to which the improper considerations have influenced the opinion. (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code, *supra*, § 803, p. 444.) Such questions are addressed to the sound discretion of the trial court. (*Ibid.*, citing *People* ex rel. *Dept. Public Works* v. *Lipari*, 213 Cal.App.2d 485, 493 [28 Cal.Rptr. 808].)

Specific rules of evidence which pertain to proceedings involving the valuation of real property are found at Evidence Code section 810 et seq.

---

to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available. [¶] (b) The fair market value of property taken for which there is no relevant, *comparable* market is its value on the date of valuation as determined by any method of valuation that is just and equitable." (Code Civ. Proc., § 1263.320.)

The value of real property may be shown only by the opinions of the owner of the property or a witness qualified to express such opinions. (Evid. Code, § 813, subd. (a).) A view of the property may also be taken. (*Id.*, § 813, subd. (b).)

Section 814 of the Evidence Code provides: "The opinion of a witness as to the value of property is limited to such an opinion as is based on matter perceived by or personally known to the witness or made known to the witness at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion as to the value of property, including but not limited to the matters listed in [Evidence Code s]ections 815 to 821, inclusive, unless a witness is precluded by law from using such matter as a basis for an opinion."

In valuing a property, a valuation expert may take into account contracts for the sale of the subject property (Evid. Code, § 815), or comparable sales of other properties (*Id.*, § 816), as well as leases of the subject property (*Id.*, § 817). The capitalized income from the subject land and existing improvements thereon may also be taken into account in determining the value of the property. (*Id.*, § 819.) In that case, "a witness may take into account as a basis for his opinion the rent reserved and other terms and circumstances of any lease of comparable property if the lease was freely made in good faith within a reasonable time before or after the date of valuation." (*Id.*, § 818.)

In condemnation proceedings, however, certain matters are inadmissible and may *not* be taken into account as a basis for an opinion as to the value of property "notwithstanding the provisions of [Evidence Code] sections 814 to 821, inclusive": the price of an acquisition for public use, if the property could have been acquired by condemnation; the price of an offer to purchase; the option price or list price; the assessed value; the value of any property or property interest other than that being valued; noncompensable items of value or damage; and "the capitalized value of the income or rental from any property or property interest other than that being valued." (Evid. Code, § 822.)

■ "An easement is an incorporeal interest in the land of another that gives its owner the right to use the land of another or to prevent the property owner from using his land." (5 Miller & Starr, Cal. Real Estate (2d ed. 1989) Easements, §§ 15:1, 15:5, pp. 389, 400, and cases cited therein [hereafter 5 Miller & Starr].) The land upon which the easement is imposed is called the servient tenement. (*Id.*, § 15:6, p. 403.) There are two types of easements: appurtenant easements and easements in gross. An appurtenant easement is one which is impressed upon the servient tenement for the use and benefit of

other property called the dominant tenement. (*Ibid.*) An easement in gross is the personal right to use the land of another. As such, there is no dominant tenement. (*Id.*, § 15:7, p. 408.) (See generally, 2 American Law of Property (1952) Easements, § 8.1 et seq.) An easement may be taken, that is, imposed upon a servient tenement by eminent domain, or the taking of a fee interest by condemnation may necessarily result in the extinguishment of appurtenant easements which run with that land. The holder of an easement is entitled to damages when the easement is taken or damaged for public use. (*County of Los Angeles* v. *Wright* (1951) 107 Cal.App.2d 235, 241 [236 P.2d 892].)

Neither the Evidence Code valuation provisions nor the Code of Civil Procedure eminent domain provisions (Code Civ. Proc., § 1263.010 et seq.) specify the method for valuing an easement. Several reported decisions address this issue, and the methodology for valuing easements is well established. Existing case law defining the fair market value of an easement in eminent domain cases is not affected by the Evidence Code valuation provisions. (Evid. Code, § 812.)

■ The value of an easement in gross, such as the easement taken in this case, is the difference in the before and after value of the strip of land taken, and not what has been gained by the public agency. (*County of San Diego* v. *Bressi* (1986) 184 Cal.App.3d 112, 123 [229 Cal.Rptr. 44]; *Redevelopment Agency* v. *Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 83 [185 Cal.Rptr. 159]; *People* ex rel. *Dept. of Transportation* v. *Southern Pac. Transportation Co.* (1978) 84 Cal.App.3d 315, 324 [148 Cal.Rptr. 535]; 5 Miller & Starr, *supra*, § 15:86, p. 616.) "Just compensation is measured by what the owner has lost rather than what the condemner has gained. [Citations.] The principle sought to be achieved by the concept of just compensation is to reimburse the owner for the property interest taken and to place the owner in as good a position pecuniarily as if the property had not been taken." (*People* ex rel. *Dept. of Transportation* v. *Southern Pac. Transportation Co., supra*, at p. 324.) " ' "He must be made whole but is not entitled to more." [Citation.]' [Citation.] In other words, the condemnee is entitled to be reimbursed for the actual value of what he or she has lost—no more and no less." (*Redevelopment Agency* v. *Tobriner* (1989) 215 Cal.App.3d 1087, 1098 [264 Cal.Rptr. 481] (*Tobriner II*).)

■ The method of valuation of an easement imposed upon property by a public agency (an easement in gross) is determined as follows. (Clarke, *Easement and Partial Taking Valuation Problems* (1969) 20 Hastings L.J. 517, 518-535.) First, the fee simple of the strip taken, before and after imposition of the easement, is valued. (*Pacific Gas & Electric Co.* v. *Hufford* (1957) 49 Cal.2d 545, 553 [319 P.2d 1033].) The difference in the before

and after values is the value of the easement. (*Ibid.*) This computation is made based on the quantity and quality of the rights in the fee taken by the easement, equated to a percentage of the fee value. For example, a right to use the surface of the land takes essentially the entire fee interest, leaving the owner of the fee with only a nominal value or right of reverter. (*People* ex rel. *Dept. P. W.* v. *Schultz Co.* (1954) 123 Cal.App.2d 925 [268 P.2d 117].) In such a case, the value of the easement may be 99 percent of the fee value. On the other hand, an underground sewer easement may leave the fee owner with substantial use of the strip. In such a case, the value of the easement may be a much smaller percentage of the fee value, e.g., 25 to 50 percent. (*Pacific Gas & Electric Co.* v. *Hufford, supra,* at p. 553.) Alternatively, if a public entity seeks to condemn an easement over land already subject to an easement, the value of the second easement is the difference in value of the strip of land before and after the imposition of the second easement. This value may only be nominal. (*City of Gilroy* v. *Filice* (1963) 221 Cal.App.2d 259, 266 [34 Cal.Rptr. 368].)[3] For other examples of the proper methodology of valuation of an easement in gross, see *County of San Diego* v. *Bressi, supra,* 184 Cal.App.3d at pages 117-118 and *Union Hollywood W. C.* v. *City of Los Angeles* (1920) 184 Cal. 535, 539.[4]

## A. *Evidence of Capitalized Value*

 Watson contends the trial court improperly excluded Genewick's valuation opinion on the ground he failed to value the easement appropriately. The District responds that Genewick failed to compute the diminution in value of the property, which is the only legally permissible method for calculating the value of an easement in condemnation.

Watson also contends that Genewick's opinion was improperly excluded pursuant to Evidence Code section 822, subdivision (a)(6), as evidence of the capitalized value of the income from other property. The District responds that the six license agreements improperly formed the basis for

---

[3]Different rules are applicable to the valuation of an extinguished appurtenant easement. (*Hemmerling* v. *Tomlev, Inc.* (1967) 67 Cal.2d 572, 575 [63 Cal.Rptr. 1, 432 P.2d 697]; *Redevelopment Agency* v. *Tobriner* (1984) 153 Cal.App.3d 367, 372 [200 Cal.Rptr. 364] (*Tobriner I*); *Tobriner II, supra,* 215 Cal.App.3d 1087; *People* ex. rel. *Dept. of Public Works* v. *Logan* (1961) 198 Cal.App.2d 581, 587 [17 Cal.Rptr. 674]; see also 14 Dankert, Cal. Real Estate Law & Practice (1993) Condemnation Practice, § 512.65; 5 Miller & Starr, *supra,* at § 15:86; Restatement of Property (1944) § 508, com. *c.,* p. 3097.)

[4]We reject appellant's contention at oral argument that the case of *San Diego Gas & Electric Co.* v. *Daley* (1988) 205 Cal.App.3d 1334 [253 Cal.Rptr. 144] sets forth a different valuation methodology. That case, which involved condemnation of an easement for high-power lines, simply states that in computing severance damages, an expert may consider buyer fear of electromagnetic radiation decreasing the value of the remaining estate and, therefore, that such evidence was not improperly admitted by the trial court.

Genewick's opinion. A review of Genewick's appraisal reveals that it was based exclusively on the capitalization of the income from the six license agreements.[5]

Our review of the record supports the trial court's conclusion that Genewick did not follow the well-established methodology for valuing easements in condemnation proceedings. Genewick valued the easement based on a hypothetical income stream from unrelated license agreements and not based on the diminution in value of the fee. As such, it was not an abuse of discretion to exclude Genewick's opinion.

At his deposition, Genewick admitted that his opinion as to the value of the subject property was based on the capitalized value of the six license agreements. Further, Genewick stated that the fee simple value for the subject properties had not been computed until after the preparation of his written valuation report of March 8th. In a supplement to that report, dated March 13th, Genewick opined that the value of the subject properties in fee was $15 per square foot. Later in the same deposition session, Genewick testified that the land was currently valued at closer to $32 per square foot. When asked whether he applied the classical methodology for valuing an easement in condemnation—estimating the before and after values of the property and computing the difference—Genewick responded on more than one occasion that he had not.[6] When asked why, Genewick said, "Because I didn't use that method of appraisal. . . . Because it wasn't relevant to this case. . . . Because it's more relevant to straight building projects and residential types of development than it is for this particular type of transaction." Later, when asked if he used the six license agreements to compute the value of the easement, Genewick responded, "I used the six comparable agreements in computing the market value of the easements."

Although Genewick claimed to have used other knowledge in addition, when asked to identify that information, he responded, "Nothing in particular. A lot of things in general." When pressed further, Genewick said that he was generally familiar with license and easement negotiations in the same

---

[5]The District also asserts that the licenses were not "arms length" transactions, since the oil and gas companies which pay the license fees need to transport their gas through Watson's land and must agree to the terms set by Watson. Genewick admitted at deposition that those license agreements followed Watson's standard provisions, including a 20-year term, 10 percent return on the property's value, and an annual Consumer Price Index adjustment.

The District also asserts that the fair market value for the easement could not exceed the fair market value of the fee as a matter of law. Genewick opined that the fee value of the property was $15 per square foot. According to the District, the value of the capitalized license fee calculation results in a $16 per square foot value.

[6]Later in his deposition, Genewick took the position that he had followed the prescribed methodology, but stated "It just wasn't done in one step, it was done in two steps."

geographic area. Lest there be any confusion about his methodology in computing the value of the subject easement, Genewick stated, "The methodology we used to compute the value of the license agreement is the same methodology that I used to compute the value of these easements." Later in the deposition, Genewick contended that the development potential for both the servient estate and the dominant estate would be negatively affected, though his testimony seemed to be based on the unsupported assumption that Watson could not build on the surface of the land on which the easements were located.

Where an expert in a condemnation action employs a methodology not sanctioned by California law, his opinion may be excluded. (*Contra Costa Water Dist.* v. *Bar-C Properties* (1992) 5 Cal.App.4th 652, 660 [7 Cal.Rptr.2d 91].) ██ " 'In condemnation proceedings, the trial court is vested with considerable judicial discretion in admitting or rejecting evidence of value.[]' " (*Ibid.*; *Tobriner II, supra,* 215 Cal.App.3d at p. 1093.) "When the testimony of a valuation witness is based on considerations which are proper as well as those which are improper, the court, in its discretion, may strike the testimony or permit it to remain and consider the impropriety in determining the weight to be given it. . . ." (*South Bay Irr. Dist.* v. *California-American Water Co.* (1976) 61 Cal.App.3d 944, 984 [133 Cal.Rptr. 166].) ██ Here, the trial court did not abuse its discretion in completely excluding Genewick's valuation opinion, since it did not, on its face, or by Genewick's own admissions at deposition, represent the prescribed method for valuing easements in condemnation actions and was based almost exclusively on improper considerations.[7]

B. *Evidence of Severance Damages*

██ Severance damages must be based upon real physical disturbance of a property right and a decrease in market value of the property rather than upon remote possibilities which are highly speculative and conjectural. (*Ventura County Flood Control Dist.* v. *Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1002 [93 Cal.Rptr. 653].)

Genewick's opinion as to severance damages suffers from the same flaws as described previously in this opinion. Genewick derived his severance damages by arbitrarily apportioning to severance a percentage (50 percent) of the total value of the easement determined by capitalizing the income from the six unrelated license agreements. We need not address whether his

---

[7]Watson's attorney presented an offer of proof as to Genewick's testimony which varied considerably from the opinion and methodology contained in Genewick's written valuation report and his deposition testimony.

apportionment was reasonable, since the gross damage figure which he apportioned was not a proper method, for the reasons previously discussed.[8]

*Motion for Continuance*

After lengthy argument on the District's motions *in limine* and the trial court's announcement of its decision, Watson requested a continuance to obtain a new valuation opinion. The denial of this request was well within the discretion of the trial court. (*Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 628 [157 Cal.Rptr. 248].) The delay associated with Watson's search for a new expert, production of a new valuation opinion, and related discovery would be significant. Watson was on notice that the District would seek to exclude Genewick's opinion as indicated on the final status conference statement of June 8, 1992. Moreover, a reading of Genewick's deposition testimony would reveal the District's position that Genewick did not use the accepted before and after valuation method and relied on improper considerations. From the start, Watson could have employed an outside expert to supplement Genewick's testimony. Further, Watson never offered to present the testimony of a Watson officer or director as "owner" of the property. Moreover, Watson did not force the District to put on its testimony and attempt to impeach the valuation of the District's expert by cross-examination. Instead, Watson capitulated to the District's valuation by stipulation. We conclude, therefore, that the trial court did not abuse its discretion in refusing to grant a substantial trial continuance.

### DISPOSITION

The judgment is affirmed. The District shall bear Watson's costs on appeal. (Code Civ. Proc., § 1268.720.)

Armstrong, J., and Godoy Perez, J., concurred.

---

[8]Watson seems to suggest further that the trial court erred in granting the motion *in limine* since it was not timely served. We need not address the parties' factual dispute in this regard, or any purported conflict between the local rules and California Rules of Court. Watson waived this objection by allowing the trial court to proceed to resolve the motion. The transcript of the hearing on the motion reveals that no objection to the timeliness of the motions was made until after a decision adverse to Watson was made.