UTAH DEPARTMENT OF TRANSPORTATION, Plaintiff and Appellee,

v.

6200 SOUTH ASSOCIATES, a General Partnership; H. Roger Boyer; Kem C. Gardner; and Valley Mortgage Corporation, Beneficiary, Defendants and Appellants.

No. 920268–CA.

Court of Appeals of Utah.

March 23, 1994.

Robert S. Campbell (argued), Kevin Egan Anderson, Mark A. Larsen, Campbell, Maack & Sessions, Salt Lake City, for defendants and appellants.

Jan Graham, State Atty. Gen., Donald S. Coleman, Chief Physical Resources Div. (argued), Salt Lake City, for plaintiff and appellee.

Before BILLINGS, DAVIS and GREENWOOD, JJ.

## OPINION

GREENWOOD, Judge:

Appellant, 6200 South Associates (Associates), appeals the trial court's Judgment of Just Compensation determining the fair market value of a portion of Associates's land condemned by the State and severance damages to the remaining property. Associates claims the trial court made erroneous rulings with respect to the scope of cross-examination and the admissibility of certain evidence and that both the individual and cumulative effects of these errors warrant reversal for a new trial. We affirm.

## FACTS

On February 5, 1988, the Utah Department of Transportation (UDOT) filed a complaint in this action to condemn 1.73 acres of a 21.23 acre unimproved parcel of land (the property) owned by Associates, for construction of a freeway interchange and connecting road to Wasatch Boulevard in Salt Lake City. The property, roughly rectangular in shape, is located in what is now the southeast quadrant of the I–215 freeway interchange (commonly referred to as the Knudsen's Corner Interchange) located just east of Holladay Boulevard and south of 6200 South. This was the third condemnation action brought by UDOT or its predecessor, the Utah State Road Commission, to condemn parcels of and access rights to the property.

The first two condemnation actions occurred in 1963 and 1973. At that time, the State intended to construct a "diamond"[1] interchange at the same location as the current interchange. Plans for the diamond interchange included construction of a frontage road along the western edge of the property, and relocation and widening of a portion of 6200 South so that it would align with the interchange. If the diamond interchange had been constructed as planned, the property would have been accessible from the west by the frontage road, from the north by 6200 South, and from the east by 3000 East.

In 1986, the Federal Highway Administration approved a design change sought by UDOT for the Knudsen's Corner Interchange. UDOT was concerned about the capacity and accompanying safety problems of a diamond interchange due to revisions in traffic volume estimates for future years and determined that an "urban" interchange[2] would be better suited to handle traffic anticipated on this interchange. An urban interchange permits smoother and freer movement of traffic in peak hours.

The change in plans resulted in this third condemnation action in which UDOT acquired three parcels of land totalling 1.73 acres, along with all access rights to the property from the west and north. The new urban design interchange plans eliminated the frontage road and extended the nonaccess line along 6200 South along the full length of the property. As a result, the property is currently accessible only from 3000 East.

At trial, the sole matter before the jury was the appropriate compensation due Associates for the condemned property. The amount of compensation included two separate, but related, components—the value of the taken property itself and severance compensation for the effect of the loss of access rights on the remaining parcel of land. This determination was made by comparing the

1. The "diamond" interchange takes its name from the fact that when viewed from above, the north and south bound on-ramps and off-ramps form a diamond-shaped configuration.

2. An urban interchange is a modified diamond interchange with off-ramps that circle under the interstate and separate traffic headed left and right so that there is less congestion at traffic lights.

value of the property before and after the taking. At an in limine hearing, the trial court ruled that the property's appraisal in its "before" condition should assume that the diamond interchange was in existence, and therefore that there was access to the property from the north, west, and east. The basis for this in limine order was that the plans for the diamond interchange had been finalized, and Associates was thus entitled to rely on this fact at the time it purchased the property in 1980.

At trial, Associates's experts claimed that the fair market value of the land taken was between $294,069 and $324,230, while UDOT's experts placed the condemned land's fair market value at between $233,746 and $282,800. The main point of contention, however, concerned the value of Associates's lost access to the remaining property. Associates's experts alleged that the value of the loss of access to the remaining property was between $1,189,127 and $1,316,534. UDOT, on the other hand, argued that the property actually benefitted by the changed design of the interchange due to the smoother flow of traffic and the intersection created at 3000 East. Accordingly, UDOT asserted that damages for lost access rights to the property should be measured by the cost to improve access roads from 3000 East. The State estimated this cost at between $28,800 and $30,870. The jury found the fair market value of the taken property to be $271,447.20 and damage to the remaining property caused by the loss of access to be $144,607.60.

At the conclusion of the trial, Associates filed a Motion for Additur or in the Alternative a New Trial. The trial court denied the motion, and this appeal followed. Associates has framed the four issues on appeal as follows: (1) Did the trial court err when it refused to strike impermissible testimony concerning an alleged offer to purchase a portion of the property? (2) Did the trial court err when it permitted UDOT's expert to testify about access to other freeway interchange properties without establishing the requisite foundation of comparability? (3) Are hypothetical questions to expert witnesses on cross-examination limited to facts in evidence in the case? (4) Did the trial court err by permitting UDOT to introduce evidence—allegedly inconsistent with the in limine ruling—regarding the flaws of the approved diamond interchange?

## STANDARD OF REVIEW

In reviewing questions of admissibility of evidence at trial, we employ two standards of review. *State v. Horton*, 848 P.2d 708, 713 (Utah App.), *cert. denied*, 857 P.2d 948 (Utah 1993). With respect to the trial court's selection, interpretation, and application of a particular rule of evidence, we apply a correction of error standard. *Id.* (citing *State v. Thurman*, 846 P.2d 1256, 1268–72 (Utah 1993)). When the rule of evidence requires the trial court to balance specified factors to determine admissibility, "[a]buse of discretion or reasonability is the appropriate standard." *Id.* (citing *Thurman*, 846 P.2d at 1270 n. 11). Further, even where error is found, reversal is appropriate only in those cases where, after review of all of the evidence presented at trial, it appears that " 'absent the error, there is a reasonable likelihood that a different result would have been reached.' " *Belden v. Dalbo, Inc.*, 752 P.2d 1317, 1319 (Utah App.1988) (quoting *State v. Speer*, 750 P.2d 186, 189 (Utah 1988)); *accord Joseph v. W.H. Groves Latter Day Saints Hosp.*, 7 Utah 2d 39, 44, 318 P.2d 330, 333 (1957).

## ANALYSIS

### Admissibility of Offers to Purchase

John C. Brown, an appraisal witness for Associates, stated that "all of the developable access to the subject property [has] been acquired by the government in the action.... It is a piece of property that no longer has any commercial development potential." UDOT rebutted this testimony with testimony by its expert appraisal witness, David VanDrimmelen, who claimed that there were other comparable properties that had been developed commercially. Further, he said that he knew this property could be used for commercial purposes because one of Associates's partners had told him that Chevron was interested in purchasing some of the property in the northeast corner of the site

for a convenience store. VanDrimmelen stated that Chevron had offered to purchase the land for $18 per square foot if there were access to the property from 6200 South, and for $10–12 per square foot if the access were via 3000 East. These figures were from 250% to 450% higher than any appraisal of the property presented during trial.

Associates promptly objected to VanDrimmelen's testimony as an inadmissible offer to purchase,[3] and the trial court sustained the objection, ruling that "the portion of the answer that related to a negotiated offer will be stricken from the record." Associates renewed the objection outside the presence of the jury a short while later, arguing that "the entire area ought to go out, not just the area with regard to the offers, but—specifically, as to those, it ought to— but also the entire area of examination ought to go out." The court declined to strike all of VanDrimmelen's testimony regarding commercial development of comparable properties, and instructed the jury:

> THE COURT: There has been some testimony given by the witness now on the stand regarding statements made by a Mr. Jacobsen, and confirmed by Chevron Oil, regarding the value of the questioned property per square foot. Specifically, there was a reference of $18 per square foot with access, $12 per square foot without access. Supposedly, that value was confirmed by a representative of Chevron Oil. *Disregard the portion of the expert witness' testimony that referred to that subject matter.*

(Emphasis added.)

Associates asserts that the trial court only ordered the dollar amount of the offer to be

stricken, arguing that if the alleged offering price is inadmissible, then the fact of the offer, and related evidence, is equally inadmissible. Associates has not cited any authority for this position and there appears to be at least some contrary case law. In *City of St. Louis v. Vasquez*, 341 S.W.2d 839 (Mo.1960), the court distinguished between inquiries and offers to purchase property. The court ruled that an inquiry is "not the equivalent of an offer to buy, and was not inadmissible for the reasons ... that an offer to buy is inadmissible." *Id.* at 848. The basis for this conclusion was that

> [t]his testimony [inquiries made by persons who wanted to purchase the property], indicating an active interest in the land in question on the part of prospective buyers, was relevant on the question of the general desirability of and demand for this land. An ordinarily prudent person would take into consideration the demand or lack of demand for the land, as a basic element in reaching a conclusion, upon the basis of other evidence, as to its fair market value.

*Id.; see also Commonwealth v. Turner*, 497 S.W.2d 57, 59–60 (Ky.App.1973) (while evidence of prices or terms of offers is not admissible, inquiries concerning possible purchase or lease of property were admissible to show that property was suitable for business purposes); *Kelly v. Redevelopment Auth.*, 407 Pa. 415, 180 A.2d 39, 45 (1962) ("Testimony that offers were made for condemned property is admissible to show that the same is desirable and marketable.").

However, we need not decide whether an offer to purchase property is admissible for

---

**3.** As a general rule, offers to purchase are inadmissible to prove the value of the property in a condemnation action because the offeror may have "so slight a knowledge on the subject as to render his opinion of no value." *Sharp v. United States*, 191 U.S. 341, 348, 24 S.Ct. 114, 115, 48 L.Ed. 211 (1903); *accord County Sanitation v. Watson Land Co.*, 17 Cal.App.4th 1268, 22 Cal. Rptr.2d 117, 122 (1993); *Costello Profit Sharing Trust v. State Roads Comm'n*, 315 Md. 693, 556 A.2d 1102, 1104, *cert. denied*, 493 U.S. 854, 110 S.Ct. 157, 107 L.Ed.2d 115 (1989); *City of Fort Worth v. Beaupre*, 617 S.W.2d 828, 831 (Tex.Civ. App.1981); *Continental Pipe Line Co. v. Irwin Livestock Co.*, 625 P.2d 214, 217 n. 5 (Wyo.1981). *But see State Toll Highway Auth. v. Heritage*

*Standard Bank & Trust*, 250 Ill.App.3d 665, 189 Ill.Dec. 272, 285, 619 N.E.2d 1321, 1334 (1993) (stating that offers to purchase admissible if offer is bona fide and for cash); *Hardaway v. City of Des Moines*, 166 N.W.2d 578, 581 (Iowa 1969) (giving exception to general rule excluding price of offers in "exceptional case[ ]" in which the evidence establishes a foundation for a bona fide offer so firmly and completely that the trial court would not abuse its discretion in receiving evidence of such offer"). In addition, offers are excluded because they are "of a nature entirely too uncertain, shadowy, and speculative to form any solid foundation for determining the value of the land." *Sharp*, 191 U.S. at 348–49, 24 S.Ct. at 115.

the limited purpose of establishing interest in the property for a particular use as this is not the situation presented in the instant case. After careful review of the record and the trial court's statements and orders, we conclude that the court struck from the record all of VanDrimmelen's testimony concerning Associates's employee's conversation with the Chevron representative about an offer to purchase the property. "[T]he rule [is] that [an] appellant cannot complain of testimony stricken from the record as prejudicial." *Baldwin v. Mittry*, 61 Idaho 427, 430, 102 P.2d 643, 646 (1940); *see also State v. Humphrey*, 793 P.2d 918, 925 (Utah App. 1990) ("We find the trial court's immediate admonition that the statement be stricken and that no further reference be made to the statement, rendered harmless the otherwise improper testimony."). Therefore, we conclude that Associates's first claim of error is without merit.

### Foundation for Admission of Aerial Photographs

■ Bryce Clinger, an appraisal witness for UDOT, testified that his evaluation of the property's fair market value considered whether access to the property after condemnation was sufficient for the type of development he thought feasible. Accordingly, he surveyed other locations along major traffic routes and interstate freeways in the Salt Lake valley to find properties with similar access restrictions and compared their development with his proposals for development of the subject property. Clinger photographed six of these properties from an airplane and testified about similarity-of-access at trial. Throughout his testimony, Clinger emphasized that the photos he used in making a decision about the subject property's highest and best use represented properties with similar access restrictions—not comparable sales.

Associates objected to admission of the six photos, claiming that "[t]here is no foundation laid to show ... any relevancy at all to the subject property, either in terms of the geography of the area—of the location of the property, or the dynamics of the market in that area. There is no foundation laid to show any transaction or sale affected by access restriction." [4] The trial court overruled the objection, stating that it went to weight, not to admissibility, and admitted the photos into evidence because they were the basis, in part, of the expert witness's opinion.

On appeal, Associates claims that it was error to admit the six aerial photographs of properties located near interchanges with access restrictions similar to the property because there was no showing that the properties were "comparable" in every way to the property at issue in this case. The requirement of "comparability" is set forth in *Redevelopment Agency v. Mitsui Investment, Inc.*, 522 P.2d 1370 (Utah 1974):

> Real estate has always been regarded as unique because no two parcels can be exactly alike. It is certainly not to be supposed that there will be found *sales* which are identical as to time, location, quantity and various characteristics of the property. The requirement is that it meet the test of "reasonable comparability." That is, that these factors exist in sufficient similarity that the sale can fairly be regarded as having some probative value in arriving at a proper appraisal of the property.

*Id.* at 1373 (emphasis added).

While *Mitsui* recites the well established law with respect to evidence of comparable *sales*, UDOT's expert witness introduced the six photographs only as evidence of development of other properties with similar *access* limitations and thus *Mitsui* is arguably inapplicable.[5] Even assuming, however, that the

---

4. Clinger did testify earlier about five comparable sales that he considered in arriving at a figure for the fair market value of the property after condemnation. The properties involved in the five sales were determined to be reasonably comparable to the property in this case based upon such factors as accessibility, size, location, visibility from major traffic routes, and use.

5. Associates argues that *Carpet Barn v. Department of Transportation*, 786 P.2d 770 (Utah App. 1990) is dispositive of this issue. *Carpet Barn* was an inverse condemnation case in which Carpet Barn claimed that it was prejudiced by the trial court's exclusion of evidence of access allowed to other comparable properties. This court held that

*Mitsui* standard does apply, the expert's testimony satisfied that standard by establishing "reasonable comparability" of access and configuration. Further, the testimony is well within the range of appropriate considerations made by appraisers. As the court noted in *Mitsui,*

> [T]he appraiser should take into account all facts and circumstances relating to the property which he thinks has a bearing on value; and ... this may include any potential use or development which is to be expected with reasonable certainty. But the work of an appraiser, though it can be in a sense factual and scientific in some of its aspects, is also an art, in that it reflects the creative talents, the experience, the integrity, and in sum, the personalized judgment of the individual appraiser. It is his prerogative to select and analyze the various factors which seem important to him in arriving at his estimate as to value. Therefore no one should be able to put him in a straightjacket as to his method; much less should they compel him to speculate as to what may happen in the future with respect to the property.

*Id.* at 1373 (emphasis added).

Given the wide latitude accorded appraisers in their endeavors to determine a property's fair market value under *Mitsui,* along with the specific reference to "potential use or development" among the facts and circum-

stances to be considered, we conclude that the trial court did not err in admitting the six photographs into evidence. As in *Mitsui,* if Clinger "fail[ed] to give proper consideration or weight to any particular factor[,] that goes to the credibility and not to the admissibility of his evidence. If it has deficiencies, they are subject to exposure on cross-examination and the weight to be given it is for the jury." *Id.* (footnotes omitted).

### Scope of Hypothetical Questions

On two separate occasions, the trial court prevented Associates from asking hypothetical questions of an expert witness. On the first occasion, Associates asked David Van-Drimmelen, UDOT's real estate appraiser, to assume that the north portion of the property had been severed from the remaining property and sold before the taking. UDOT objected to the question on the grounds that it assumed facts not in evidence, and the court sustained the objection.[6] On the second occasion, Associates asked VanDrimmelen to assume that before the taking there was only one access to the property from 3000 East. UDOT again objected and the court sustained this objection, stating that "[t]he Court's position is that the witness should not assume facts not in evidence."

■ Associates contends that it is well established that the scope of hypothetical

---

[b]ecause appellants failed to demonstrate *complete similarity* between the other properties and their own circumstances, the *court did not abuse its discretion* in refusing to allow evidence of access afforded other properties, especially since such evidence would have little bearing on the question of the diminished value of this property as a result of the severance. *Id.* at 775 (emphasis added). We agree that the phrase "complete similarity" is problematic, but conclude that when examined in the context of the opinion and in light of other Utah Supreme Court opinions, it does not require the result urged by Associates.

In the same paragraph and just prior to the language quoted above, this court relied on the supreme court case of *State Road Commission v. Christensen,* 13 Utah 2d 224, 229, 371 P.2d 552, 556 (1962), for the proposition that "the issue of reasonable access as it affects a determination of severance damages is dependent on the particular facts and circumstances of each case." *Carpet Barn,* 786 P.2d at 774. *Christensen,* therefore, approved a flexible, fact-intensive approach

to admissibility of evidence regarding access, which is consistent with *Mitsui*'s requirement of "reasonable comparability." This approach is further bolstered by the standard of review analysis in the recent case of *State v. Pena,* 869 P.2d 932, 938–40 (Utah 1994), in which the Utah Supreme Court observed that while admissibility of evidence is generally a question of law, it is a relatively large "pasture" where trial courts are still accorded a considerable amount of discretion. Consistent with that notion, the *Carpet Barn* opinion found no abuse of discretion by the trial court in excluding the disputed evidence and, we believe, should be limited to the particular facts of that case. To the extent that the opinion appears to require "complete similarity" of comparable properties, it is contrary to controlling case law from the Utah Supreme Court.

6. Associates's subsequent attempt to rephrase the question resulted in virtually the same question being asked, and the objection that the question assumed facts not in evidence was again sustained.

questions on cross-examination is extremely broad. "[A]lthough on direct examination the hypothetical questions must be based upon facts which the evidence tends to prove, no such limit is ordinarily imposed upon cross-examination." Burr W. Jones, *Jones on Evidence Civil and Criminal* § 14.29, at 665–66 (6th ed. Supp.1991). UDOT concedes that this is a correct statement of the majority rule, but further responds that Utah follows the minority view that hypothetical questions on cross-examination are limited to facts in evidence:

> "It is a proposition too simple to require any citation of authorities that the material facts assumed in a hypothetical question [on cross-examination] must be proven on the trial, or rather, that there must be evidence on the trial tending to prove them; otherwise it is error to allow them to be answered."

*Nichols v. Oregon Short Line R.R. Co.,* 25 Utah 240, 247, 70 P. 996, 998 (1902) (citations omitted).

While *Nichols* addresses this issue, a subsequent case calls into question the continued vitality of the *Nichols* holding. In *State v. Peek,* 1 Utah 2d 263, 265 P.2d 630 (1953), the supreme court quoted extensively from 5 Nichols, *Law of Eminent Domain* § 18.45(2), at 183 (1992), which states:

> "The scope of the cross-examination of experts and other witnesses who have testified to value in land damage cases is very broad, since cross-examination is often the only protection of the opposing party against the unwarranted estimates that a certain class of mercenary experts is wont to indulge in. A witness may be asked on cross-examination any facts which would be admissible on direct examination.... *A witness who has given an opinion of value may, however, in the discretion of the court, be asked questions on cross-examination, for the purpose of testing his opinion, which would be improper upon direct examination. He may, for example, be asked how far certain assumed facts would modify his judgment* ...."

*Peek,* 265 P.2d at 637–38 (emphasis added). Therefore, it appears that the supreme court has effectively overruled the holding in *Nich-ols,* and hypothetical questions assuming facts not in evidence are permissible in the discretion of the court during cross-examination.

■ Based upon our reading of *Peek,* we conclude that the trial court erred when it prevented Associates from posing hypothetical questions to VanDrimmelen that did not include facts in evidence. The trial court's ruling was apparently based on an inaccurate view of the law rather than an exercise of permissible judicial discretion. However, it is not enough to show error—Associates also has the burden of establishing that this error was prejudicial. *Joseph v. W.H. Groves Latter Day Saints Hosp.,* 7 Utah 2d 39, 44, 318 P.2d 330, 333 (1957). Associates has not carried this burden. While Associates was not permitted to pose a question assuming that the north portion had been sold before the taking and was therefore landlocked after the taking, the court did allow Associates to ask VanDrimmelen whether it was true that the landowner no longer had the same flexibility in dividing the property for sale in parcels since access was so limited after the taking. As for the second disallowed hypothetical involving the assumption that there was originally access to the property only from 3000 East, the court later permitted Associates to pose the same question using a hypothetical piece of property. Therefore, there was no prejudice resulting from the trial court's erroneous application of the law concerning hypothetical questions on cross-examination because Associates was ultimately permitted to ask the expert witness the desired questions.

## In Limine Ruling

■ The narrow issue on appeal is whether UDOT disregarded the trial court's in limine order that, for purposes of determining the "before" value of the property, the parties were to assume that the diamond interchange was constructed as planned. The trial court ruled at the hearing on the motion in limine that the property's value before condemnation was to be determined by assuming the presence of the I-215 *diamond* interchange and attendant frontage

and feeder roads as set forth in the UDOT plans attached to the complaint.

At trial, the UDOT expert witnesses testified that the planned diamond interchange's benefit to Associates's property was limited because the feeder road, 6200 South, was too narrow to efficiently feed and receive traffic and therefore traffic would be congested around the access points to the property. To support this contention, UDOT pointed out that the final plans for the interchange filed with the court indicate that 6200 South would be relocated and widened just before the interchange, but in all other respects would remain the same.

Associates's witnesses conceded that the plans for the diamond interchange did not include a connector road to Wasatch Boulevard and did not provide for any changes to 6200 South beyond those necessary to align this road with the interchange. Associates argued, however, that the diamond interchange plan would necessarily include widening and improving 6200 South up to the connection with Wasatch Boulevard because it would not make sense to build a new interchange and leave an old and problematic feeder road in place. Further, Associates provided testimony that the State had tentative plans to build a connector road from the interchange to Wasatch Boulevard that were separate from the interchange plans at issue in this case.

Although the State may have had separate plans to build some form of connector road at an undetermined point in the future, these plans were not before the court at the time of the in limine hearing and were not part of the court's ruling. Indeed, these additional plans were not presented as part of either of the two earlier condemnation proceedings for the Knudsen's Corner Interchange. For these reasons, we conclude that UDOT did not contravene the court's in limine ruling by introducing evidence concerning limitations of the diamond interchange as designed.

## CONCLUSION

After review of each of Associates's four assertions of error, we conclude that only one has merit. The trial court incorrectly stated

the law in eminent domain cases regarding the use of assumed facts in cross-examination and therefore improperly disallowed two lines of questioning. However, because the trial court later permitted Associates to ask essentially the same questions, Associates cannot establish the prejudice required to reverse and remand for a new trial. Accordingly, we affirm the judgment.

BILLINGS and DAVIS, JJ., concur.