[No. D038190. Fourth Dist., Div. One. Feb. 1, 2002.]

THE PEOPLE ex rel. DEPARTMENT OF TRANSPORTATION, Plaintiff and Appellant, v.
THE CLAUSER/WELLS PARTNERSHIP, Defendant and Respondent.

---

**COUNSEL**

Breland C. Gowan, David R. Simmes, Christopher Hiddleson and Robert W. Vidor for Plaintiff and Appellant.

Laskin & Graham, Graham Vaage & Cisneros, Arnold K. Graham and John M. Kirwan for Defendant and Respondent.

## Opinion

**KREMER, P. J.**—In this eminent domain action brought by the People of the State of California, acting by and through the Department of Transportation (Caltrans) as plaintiff, Caltrans appeals a judgment after jury trial favoring defendant The Clauser/Wells Partnership, doing business as Manchester Auto Salvage, Inc. (Manchester) on Manchester's claim for compensation for condemned business inventory. Caltrans asserts prejudicial evidentiary error. Caltrans also appeals a postjudgment order awarding Manchester litigation expenses and costs. We reverse the judgment and the order.[1]

### I

### Introduction

Manchester operated an automobile salvage business engaged in selling auto parts on real property condemned by Caltrans to widen a freeway. By the time of trial in Caltrans's eminent domain action, the only remaining matter for litigation was the valuation of Manchester's business inventory. Under the Eminent Domain Law, the proper measure of compensation was the fair market value of Manchester's business inventory taken by Caltrans. (Code Civ. Proc., § 1263.310.)[2] The parties stipulated that Caltrans was to compensate Manchester for the fair market value of its business inventory as of December 1, 1996, the date of valuation.

Caltrans's inventory appraiser Donahue opined that Manchester's inventory's fair market value was $439,220. At a pretrial foundational hearing under Evidence Code section 402, Donahue testified that in forming his opinion he followed Caltrans's counsel's legal instructions to value the inventory as a bulk sale rather than individual sales and to base the fair market value on the inventory's wholesale value by removing the "future consideration" of profit. Donahue also testified he arrived at his opinion of fair market value by taking the inventory items' retail value, removing a 50 percent profit markup to reach wholesale value, deducting for the percentage of items that would not sell, applying a liquidation value to those items, and then adding such liquidation value to the downward adjusted wholesale

---

[1]Caltrans's successful appeal of the judgment necessarily requires reversal of the postjudgment order as well.

[2]Code of Civil Procedure section 1263.310 provides: "Compensation shall be awarded for the property taken. The measure of this compensation is the fair market value of the property taken." All further statutory references are to the Code of Civil Procedure unless otherwise specified.

value. The court excluded Donahue's testimony as based upon incorrect legal instructions and lacking sufficient evidentiary foundation.

At trial, Manchester's inventory appraiser Crockett testified the inventory's fair market value was $2,178,390 based essentially upon the aggregated retail sale values of all inventory items in saleable condition. The jury returned a verdict favoring Manchester in the amount of Crockett's valuation opinion.

Caltrans contends the court reversibly erred in excluding the testimony of its inventory appraiser Donahue. Concluding Donahue's valuation opinion was based upon a proper legal standard and supported by sufficient evidentiary foundation to be heard by the jury, we reverse the judgment.

## II

### FACTUAL AND PROCEDURAL BACKGROUND

Founded in 1950, Manchester's auto salvage business specialized in the niche market of Ford, Chrysler and Mitsubishi auto parts products. Manchester's business consisted of acquiring salvageable auto bodies and then dismantling, inventorying, testing, repairing/replacing, rebuilding, cleaning and painting the refurbished and reconditioned parts as needed to make those items saleable to the public.

Manchester kept thousands of parts in inventory. Each of those parts was inventoried, handled and labeled. Manchester gauged its supply by consumer demand and reviewed its inventory regularly to dispose of nonsaleable items.

Manchester opened its store to the public and sold its products to anyone who came to the store for over-the-counter purchases. Manchester also had business customers, including insurance companies, garages, body shops and auto dealerships. Manchester's prices were the same regardless who was the customer.

In May 1996 Caltrans filed its complaint in eminent domain. Since Manchester's attempts to find a relocation site for its business did not succeed, Caltrans took by condemnation each component of the entirety of Manchester's business, including real estate, improvements, fixtures, equipment, goodwill and business inventory. On the stipulated date of valuation, Manchester vacated the property and transferred its entire business, including all its business inventory, to Caltrans. The eminent domain case then proceeded through various pretrial conferences and hearings.

In March 1998, after an unreported hearing on the issue of the definition of fair market value as applied to Manchester's inventory taken by Caltrans, Judge Thomas issued a minute order providing: The jury would be instructed with section 1263.320's definition of fair market value;[3] the wholesale valuation standard for retail inventory set forth in *McMahan's of Santa Monica v. City of Santa Monica* (1983) 146 Cal.App.3d 683 [194 Cal.Rptr. 582] (*McMahan's*) was "not appropriate" to Manchester's factual circumstances;[4] and Manchester could introduce evidence of "sale value to the public." In June 1998 Judge Thomas issued a written "clarification" of his earlier minute order by reaffirming section 1263.320's definition of fair market value and distinguishing the facts here from those in *McMahan's*.

In January 1999 when the matter came on for trial, the court (Judge Selna) stated that, as Judge Thomas had earlier held, the jury would be instructed to decide the valuation issue on the basis of fair market value as statutorily defined and Manchester could introduce the retail price of its inventory items as evidence of fair market value. However, Judge Selna also noted that Judge Thomas's initial minute order and the subsequent clarification did not indicate that evidence of the inventory's wholesale value would be excluded

---

[3]Section 1263.320, subdivision (a) provides: "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."

[4]In *McMahan's, supra,* 146 Cal.App.3d 683, a retailer's inventory was damaged by water from a broken municipal water main. (*Id.* at p. 687.) The appellate court held that the trial court properly rejected the retailer's proffered special instruction that would have told the jury: " 'As to the merchandise losses suffered by plaintiffs, the compensation for those losses may be based on the *retail value* of the merchandise less average discounts.' " (*Id.* at p. 700.) In doing so, the appellate court rejected the retailer's contention that "the proper standard of 'just compensation' for a retailer in an inverse condemnation is the retail value and not wholesale value of personal property damaged." (*Id.* at pp. 699-701.) The appellate court observed: "Unlike real property, the items of [the retailer's] inventory that were damaged were not unique, but completely fungible and readily replaceable." (*Id.* at p. 700.) The court also observed that "the damaged inventory was part of a 'model stock of inventory' carried by other" stores affiliated with the retailer, "no undue hardship was incurred in replacing the damaged merchandise with other identical merchandise," and the retailer "purchased such merchandise at the cost figures testified to at trial." (*Ibid.*) Noting that "evidence of the wholesale value of the damaged inventory was presented in terms of [the retailer's] replacement cost" and the "jury's award for the inventory damages was consistent with" such evidence (*id.* at p. 701), the appellate court concluded: "To award [the retailer] retail value instead of wholesale value would result in a windfall to [the retailer]—an award in excess of just compensation sufficient to make [the retailer] whole. Here, the proper standard of fair market value is the wholesale value. This is what a retailer, whose inventory of nonunique, fungible, and readily replaceable goods is damaged as a result of an act of inverse condemnation, should receive." (*Id.* at p. 700.)

as a matter of law. Accordingly, Judge Selna conducted an evidentiary hearing to determine whether there was sufficient foundation for Caltrans's inventory appraiser Donahue to present to the jury his opinion on the inventory's fair market value based in part on consideration of wholesale value. At that hearing, Donahue testified he followed Caltrans's counsel's legal instructions to value the inventory as a bulk sale and at wholesale. Donahue also testified about the methodology he used to arrive at his valuation opinion. At the conclusion of the hearing, the court excluded Donahue's proffered testimony.

Since the parties had reached agreement on each of Manchester's other claims for just compensation, trial then began on the sole issue of the fair market value of Manchester's business inventory as of the date of valuation. At trial, Caltrans did not present any expert evidence on the inventory's fair market value. However, inventory appraiser Crockett testified for Manchester. The jury returned a verdict in the amount of Crockett's valuation opinion. The court entered judgment on the jury's verdict favoring Manchester and later awarded Manchester litigation expenses and costs. Caltrans appeals the judgment and the order awarding litigation expenses and costs.

## III

### DISCUSSION

Seeking reversal of the judgment and remand for a new trial, Caltrans contends the court denied it a fair trial by excluding Donahue's opinion testimony on the fair market value of Manchester's business inventory. On this record we conclude the court prejudicially erred in excluding Donahue's testimony.

### A

#### *The Law*

"The constitutional requirement of just compensation applies to both eminent domain and inverse condemnation actions. [Citation.] The usual measure of just compensation is the fair market value of the property taken." (*McMahan's, supra*, 146 Cal.App.3d at p. 700.) "A condemnation trial is a sober inquiry into values, designed to strike a just balance between the economic interests of the public and those of the landowner." (*Sacramento, etc. Drainage Dist. ex rel. State Reclamation Bd. v. Reed* (1963) 215 Cal.App.2d 60, 69 [29 Cal.Rptr. 847].) The goal of the eminent domain trial was "to determine just compensation," to wit, to put Manchester in "as good

a position" as if its business inventory had "not been taken." (*People ex rel. Dept. of Transportation v. Leslie* (1997) 55 Cal.App.4th 918, 923 [64 Cal.Rptr.2d 252].) However, Manchester was only "entitled to be reimbursed for the actual value of what [it] lost—no more and no less." (*Redevelopment Agency v. Tobriner* (1989) 215 Cal.App.3d 1087, 1098 [264 Cal.Rptr. 481].)

■ In reviewing Caltrans's contention that the trial court erred in excluding Donahue's testimony, we apply "an abuse of discretion standard." (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1522 [3 Cal.Rptr.2d 833].) " ' "In condemnation proceedings, the trial court is vested with considerable judicial discretion in admitting or rejecting evidence of value.[]" ' " (*County Sanitation Dist. v. Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1282 [22 Cal.Rptr.2d 117]; accord, *Korsak*, at p. 1523 ["A trial court enjoys broad discretion in ruling on foundational matters on which expert testimony is to be based"].) "However, the discretion to admit or exclude evidence is not unlimited. 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]' " (*Korsak*, at p. 1523.)

B

*Donahue's Testimony*

■ We state the relevant portions of Donahue's testimony proffered at the foundational evidentiary hearing and excluded by the court.

Caltrans assigned Donahue to appraise the fair market value of Manchester's business inventory as of the date of valuation. Specifically, Donahue was to determine the highest fair market value between a willing buyer and a willing seller. In forming his valuation opinion, Donahue followed a legal instruction from Caltrans's attorney to value Manchester's inventory at wholesale cost, characterized by Donahue as reflecting "the removal of profit, which is a future consideration." Donahue's assignment also included Caltrans's counsel's legal instruction to value the inventory as a bulk sale rather than individual sales.

To help him appraise Manchester's auto parts inventory, Donahue hired three subcontractors (Fiskin, Schulberg and Schulberg's son) who were familiar with the auto salvage industry and, in particular, with Manchester's business. On two occasions in November 1996, Donahue and Fiskin went to the site of Manchester's business, conversed with Manchester's principals,

and counted, described, photographed and videotaped each item of inventory except for the front end parts that were listed as a group rather than individually upon being described by Donahue's subcontractors as having only salvage value.

Since Donahue was unaware of any methodology on how to assign a fair market value to auto parts inventory, he sought to determine a methodology "right from the start." Donahue's object was to "come up with the price or the contributory value of the inventory" to Manchester's business. Thus, after listing Manchester's inventory items, Donahue and his subcontractors began researching "the fair market value, or the contributory fair market value of the inventory to the business." In doing so, Donahue enlisted his subcontractors' assistance in establishing both the "retail" and "cost" of Manchester's inventory.[5]

Eventually, Donahue developed a specific methodology for appraising Manchester's business inventory. Donahue's fair market value for the inventory was based not on "retail," but instead on the inventory's "wholesale costs," "wholesale price" or "wholesale value." Based upon books, courses and conversations with business valuation appraisers and brokers about how inventory is transferred, Donahue believed the typical way "businesses are bought and sold, the way that the inventory is bought and sold on the open market is wholesale cost" that is "[s]ometimes" adjusted "downward" to "cover for older stock, or stock that's out of date, or damaged stock. But, certainly wholesale cost is someplace to start."

However, with respect to valuing Manchester's auto parts inventory, wholesale value was "difficult" to ascertain because an appraiser could not "call around and find out" the wholesale cost of an auto part. Further, since the nature of the business typically involved items dismantled from cars, there was "no set cost."[6] Hence, Donahue and his subcontractors first arrived at a "retail price" on their "entire list of inventory." Donahue started at "retail" because it was "something" that an appraiser could "get a price on" since computer systems had "retail" and other dealers had "retail." Included

---

[5] In later testifying at trial, Manchester's inventory appraiser Crockett stated that dealer cost was what Manchester actually paid for the parts in its inventory, including not only the vehicles but also the initial preparation of those vehicles. Crockett also testified that dealer cost was not the highest value under the circumstances and had no relationship whatsoever to the inventory's fair market value on the date of valuation.

[6] Donahue testified: The ideal analytical "market to duplicate" an auto parts salvage yard "would be purchasing automobiles and then dismantling them"; however, "part of the difficulty in this assignment is there isn't a wholesale market for parts." Similarly, in later testifying at trial, Manchester's inventory appraiser Crockett stated that "throughout" the "industry there is no such thing as a wholesale price."

in such "retail price" were "costs" consisting of all material and labor costs to acquire/tow/dismantle each vehicle, process Department of Motor Vehicles paperwork, prepare/clean/recondition each part, prepare a written inventory and place the part in stock. After two of Donahue's subcontractors provided the cost of each inventory item, Donahue and his subcontractors decided which cost to use, "usually" the "highest one."[7]

After reaching the "retail price," Donahue removed from such price a "keystone markup" of 50 percent as the assumed profit. Donahue did so based upon conversations with "six or eight different distributors and dealers" about the "typical markup" and as consistent with teachings in business school. In essence, Donahue "took retail and removed the markup to come up with a wholesale price."

From such "wholesale price," Donahue then deducted for the percentage of items that his subcontractors opined would not sell in an orderly fashion. Donahue calculated such percentage of inventory items that "were not going to sell" or "likely" would not sell on a line-item basis. Although Donahue's subcontractors were unable to tell how long Manchester would hold any particular item of inventory before selling it, Donahue used the "number that benefited" Manchester in "virtually" every instance, to wit, "the highest possible percent that would sell." The adjustment for inventory items that would not sell was warranted by the presence of "a lot of inventory" unlikely ever "to sell," a problem encountered in valuing a "tremendous amount of inventory at an auto salvage yard." Further, a buyer of the entire business "would not be willing to pay wholesale price on every asset in that yard, because that buyer isn't going to sell every asset."

After determining the amount of Manchester's inventory that would not sell at retail, Donahue calculated the portion of such inventory that would sell at liquidation value. Donahue "applied an orderly liquidation value to the items that were unlikely to sell, which is basically what the business would have to liquidate those items for." Finally, Donahue arrived at the fair market value of the inventory by adding the liquidation value to the wholesale value that had been reduced based upon the percentage of possible sales.

---

[7]Donahue acknowledged that all of Manchester's inventory items were available at whatever price was negotiated between Manchester and the buyer. Donahue also acknowledged that except for engine cores sold at wholesale for rebuilding, Manchester was in the business of selling its inventory at retail to anyone who wanted to buy it. However, in determining the values of Manchester's inventory items, Donahue did not consider the fact that Manchester sold those items to anyone who would buy them. Further, Donahue did not talk to Manchester's principals or customers about their retail transactions. Donahue believed that such retail sales were not necessarily open market transactions.

In sum, Donahue took the "retail price" of Manchester's inventory items, including all costs incurred by Manchester in preparing the items for sale, removed the profit from such price to reach the wholesale value, deducted for the percentage of items that would not sell, applied a liquidation price to those items, and then added the liquidation price to the downward adjusted wholesale price to reach a fair market value reflecting market value on the open market.[8] Further, consistent with the legal instructions of Caltrans's counsel, Donahue's opinion of the overall fair market value of Manchester's inventory contemplated a theoretical bulk sale of the entirety of Manchester's business, including its inventory, to a theoretical buyer who would need a cushion to make a profit on resale of such inventory and would thus refuse to pay retail.[9]

C

*Trial Court Ruling Excluding Donahue's Testimony*

In excluding Donahue's testimony, the court stated: "I do not believe that the instruction that he was given correctly states the duty of an expert who's asked to make a fair-market valuation for purposes of an eminent domain proceeding. I think that is stated in the statute. And clearly an instruction that he was given varies from it."

The court also stated there was "a second issue that would require me to exclude the testimony. Even if the instruction were legally accurate, I do not believe that factual testimony was offered to support the . . . position that with respect to this business and its unique inventory, that one would value the inventory in the manner which the witness did value it. [¶] He testified that typically in businesses, there is a keystone, a hundred-percent markup. In other words, wholesale would be 50 percent. And he gave as an example clothes at a clothing store. His basis did not relate to the specifics of this industry. Indeed his example is very similar to the example in [*McMahan's, supra*, 146 Cal.App.3d 683]. I think that, as a factual matter, he did not present a factual basis for supporting an opinion that one makes a 50-percent reduction. [¶] He indicated he talked to six or eight distributors and dealers with regard to removing the [retail] markup. Didn't identify who those were. Didn't identify what industries those were. And there's no basis to conclude

[8]According to Donahue, fair market value was less than retail value, usually less than wholesale value and never less than liquidation value. Thus, fair market value was usually between wholesale value and liquidation value.

[9]Similarly, in later testifying at trial, Manchester's inventory appraiser Crockett stated that if a buyer went into Manchester's business and said he was willing to buy the entire inventory, such buyer "probably would not" pay retail prices to a willing seller.

that those individuals or those industries are applicable in this record to the salvage business that's in question here. [¶] In short, I do not believe that there's a basis upon which he can express to a jury that a willing buyer and willing seller would strike a transaction on the basis that he testified."[10]

## D

### Analysis

Caltrans contends the court abused its discretion in excluding from the jury's consideration Donahue's appraisal method and resulting valuation opinion as based upon an improper legal standard and lacking foundation. On this record the court should have permitted Donahue to testify to the jury at trial.

### 1

### Applicable Legal Standard for Determining Fair Market Value

Asserting its counsel properly instructed inventory appraiser Donahue to value Manchester's business inventory as a bulk sale and at wholesale, Caltrans contends the court erred in excluding Donahue's testimony based upon the ground that counsel's instructions to Donahue incorrectly stated the standard for determining fair market value. We conclude the court should have found that Caltrans's counsel's instructions to Donahue were not inconsistent with California law.

### (a)

### Court's Pretrial Rulings on Valuation Standard

Preliminarily, Caltrans contends the court erred to the extent that Judge Thomas's initial rulings and Judge Selna's interpretation of those rulings purported to bar any consideration of the wholesale value of Manchester's inventory. However, the record reveals that despite Judge Thomas's rulings, Judge Selna permitted Caltrans to attempt to establish through Donahue's proffered testimony that wholesale value could properly be considered in determining Manchester's inventory's fair market value.

---

[10]The court also stated it had "some concern" about Donahue's reliance on his subcontractors: "He indicated that he relied on them but that he did a market test. [But] that market test turned out to be turning to Mr. Fiskin and the father and son Schulberg. [¶] I don't know that I would reject the opinion on that basis, but it certainly on the overall ground makes it a close question."

As noted, Judge Thomas's initial minute order stated that the jury would be instructed with the statutory definition of fair market value (§ 1263.320); the wholesale limit placed on the fair market standard in *McMahan's*, *supra*, 146 Cal.App.3d 683, was not appropriate to Manchester's circumstances; and Manchester could introduce evidence of the sale value to the public. In later clarifying his initial minute order, Judge Thomas reaffirmed section 1263.320's definition of fair market value and distinguished *McMahan's* facts from those here.

Eventually, when the matter came on for trial, Judge Selna concurred with Judge Thomas that the jury should be given the statutory definition of fair market value and that Manchester could introduce its inventory items' retail price as evidence of fair market value. However, although observing that Judge Thomas's initial minute order and later clarification did not exclude evidence of wholesale value as a matter of law, Judge Selna noted that Judge Thomas had seemed to do so in his colloquy with counsel.[11] Judge Selna also noted the difference between using the wholesale value as the sole measure of fair market value as a matter of law and considering evidence of wholesale value as a component of an "overall analysis" to reach fair market value. With respect to whether the jury could hear evidence of "some lesser value than full retail, assuming that there's competent evidence supporting [such lesser value] as a potential indicator of what a willing buyer, willing seller would negotiate," Judge Selna stated it was not clear "as a matter of law" that Caltrans "would be unable to show that there is competent evidence that . . . a fair market transaction might take place at some price

---

[11]In June 1998, in seeking to clarify orally his earlier March 1998 minute order, Judge Thomas had stated: The jury would determine whether retail value should be the "measurement" of fair market value under section 1263.320; *McMahan's* wholesale limitation was not appropriate here since "wholesale value is the determination of a product that is received in a finished state for purposes of retail"; he "wanted to allow" Caltrans "to introduce evidence in regard to the amount of items that were placed into the wholesale value of the product"; and "the issue in regard to the wholesale price could come into evidence by way of those items that were added by" Manchester "to those parts that were received."

In responding to Manchester's counsel's request for further clarification, Judge Thomas stated his previous ruling was that under *McMahan's*, "the wholesale standard was not allowed to be cited as the fair market value"; and that Caltrans was not "allowed to use the wholesale value in this matter as the restraint on what" Manchester "could obtain by way of submitting the matter to the trier of fact."

Caltrans's counsel then asked if Caltrans would be able to "introduce evidence of the actual purchase price of certain commodities and the cost to refurbish in order to get at what is an entirety of wholesale cost to that operator. Not as a limit on what the jury should award, but as relevant evidence for the jury to consider." The court replied: "No. The standard is going to be what the fair market value of the product is. You're . . . going back to the wholesale value again."

other than 100 percent retail."[12] Judge Selna also expressed his reluctance to preclude Caltrans from putting on such evidence and "attempting to make a showing that it constitutes what a willing buyer or willing seller would negotiate." Similarly, Judge Selna stated Caltrans should "have a chance to prove that wholesale, however it's defined, is a price at which the market would entertain a transaction between a willing buyer, and a willing seller. . . . Once I've heard the proof, it may be unsustainable opinion. . . . But, at this point I'm not willing to basically preclude their expert entirely." Although expressing his concern whether Donahue could "lay the foundation," Judge Selna stated he was "willing to give him a chance. And I guess I'm persuaded probably the better way to do that is to have a 402 hearing. And I think we ought to do that at the outset." Judge Selna also stated he wanted to give Donahue "his shot, and I'm prepared to do that out of the presence of the jury." Finally, Judge Selna stated: If Donahue "can present evidence going back to the standard under which the jury has to be instructed, that's competent, . . . I'll let him present that to the jury. [¶] But my focus is, I don't care what methodology you adopt, it's got to be tied back in order to go to the jury in a credible fashion, the issue of what would a willing buyer and a willing seller do. [¶] Methodologies, formulas in the abstract I don't think really get to that issue. You've got to link to what the willing buyer and willing seller would do."

Judge Selna then proceeded to conduct a hearing on whether there was a sufficient evidentiary foundation for Caltrans's inventory appraiser Donahue to present to the jury his opinion of the fair market value of Manchester's inventory reached through considering the inventory's wholesale value. At the outset of the foundational hearing, Judge Selna told Caltrans: "All I want you to do is to put on your prima facie valuation case. And you can do it in abbreviated fashion." Further, although stating he was bound by Judge Thomas's prior ruling and found it supported by the evidence presented, Judge Selna characterized such ruling as "simply" that "the wholesale value may not be used as a limiting factor, or a cap." Finally, Judge Selna stated he was "struggling with" an issue he hoped would be addressed in Donahue's

---

[12]Caltrans's counsel had argued that Caltrans was effectively buying Manchester's business and if Caltrans were doing so "in an arm's length transaction in the open marketplace, [Caltrans] would never pay what the sum of the individual items would go for in the market. [Caltrans] would pay a lump sum price. And that lump sum price would be a price that I think would probably approximate the wholesale value, for the following reason: That if you buy a business, you buy the business to make money. And if you buy the inventory at its retail value, you cannot make money, because you've lost your profit. You buy it at wholesale, so that you can mark up the retail, and turn a profit." Counsel had also argued that if Caltrans paid Manchester retail for the inventory, Manchester would receive an "absolute windfall" by not having to pay any of the normal business operating expenses (i.e., rent, salaries, utilities, advertising) for the future years it would have taken for Manchester to sell such inventory.

examination, to wit, "whether there is any basis for accepting testimony that a willing buyer and a willing seller would settle on wholesale, as a function of the marketplace."

Caltrans contends the rationale of *McMahan's, supra,* 146 Cal.App.3d 683—that the proper measure of fair market value of a retailer's inventory damaged by a governmental entity is its wholesale value on the date of taking—was applicable to this case even though Manchester's inventory consisted of recycled and refurbished auto parts rather than model stock furniture.[13] Caltrans contends that in assertedly barring consideration of wholesale value, Judge Thomas's initial minute order and later clarification erroneously concluded the retailer's business in *McMahan's* was distinguishable factually from Manchester's auto parts business. Caltrans notes that, like the retailer in *McMahan's,* Manchester relied upon a continuous source of supply and provided an end-product for sale at retail prices to the public. Further, asserting Manchester's inventory consisted of nonunique auto parts similar to the "model stock" carried by the retailer in *McMahan's,* Caltrans contends that at a minimum the question was for the jury whether Manchester's auto parts were truly unique and not readily replaceable. Caltrans thus concludes Judge Thomas's asserted factual and legal errors contributed to Judge Selna's exclusion of Donahue's valuation opinion at the foundational evidentiary hearing. Moreover, in any event, regardless whether the facts in *McMahan's* were essentially similar to those here, Caltrans contends Donahue properly considered as a component of Manchester's inventory items their "retail price," including all costs of readying those items for sale, and correctly declined under *McMahan's* to include in the inventory's fair market value Manchester's profit or "markup" of such retail price above Manchester's costs.

However, Judge Thomas's pretrial rulings were superseded insofar as Judge Selna made his own interpretations of those rulings as well as rulings

---

[13]In *McMahan's, supra,* 146 Cal.App.3d 683, the appellate court stated: "The wholesale standard which we adopt in this decision is consistent with section 911, comment d, of the Restatement of the Law of Torts (1939) which provides as follows at pages 566-567: 'd. Wholesale or retail value. From the time when a chattel is manufactured to the time of its actual use, there may be many markets in which it is sold. Thus, different prices are paid by the wholesaler, the retail dealer and the consumer. Since the measure of recovery is determined by the harm done, the market which determines the measure of recovery by a person whose goods have been taken, destroyed or detained is that to which he would have to resort in order to replace the subject matter. Thus the consumer can recover the retail price; the retail dealer, the wholesale price. The manufacturer, who does not buy in a market, receives his selling price. Damages for the profits which the wholesale dealer or the retail dealer would normally anticipate from a sale are not ordinarily allowed. . . .' " (*Id.* at pp. 700-701, italics omitted.)

of his own. As discussed, to the extent Judge Thomas's initial minute order and later clarification could have been interpreted as precluding as a matter of law any evidence of the wholesale value of Manchester's business inventory, the record reveals that Judge Selna did not proceed under that interpretation. Instead, Judge Selna deferred any ruling on the admissibility of evidence of wholesale value until Caltrans's inventory appraiser Donahue had the opportunity to present evidence indicating a willing buyer and a willing seller would agree to a market transaction at wholesale value. In sum, although concurring in some of Judge Thomas's findings, Judge Selna did not preclude as a matter of law all evidence of wholesale valuation. Indeed, on several occasions in the trial court, Manchester's counsel argued to Judge Selna that Judge Thomas's rulings were not being given sufficient deference. Specifically, Manchester's counsel argued that Judge Thomas had stated that Caltrans could not "factor" into its opinion "the wholesale value of this inventory. It's a direct erosion of Judge Thomas' ruling." Manchester's counsel also told Judge Selna: "I know Your Honor has tentatively ruled on the wholesale issue. I guess I have a discomfort level as to how that squares with what Judge Thomas ruled, and how wholesale, by any market definition, can be fair market value."

In sum, contrary to Caltrans's contentions, Judge Selna did not rule as a matter of law that evidence of Manchester's inventory's wholesale value was inadmissible for any purpose or that the inventory's retail value was the only proper measure of fair market value. However, as we shall explain, although properly permitting Donahue to attempt to establish his wholesale value methodology as an appropriate measure of the fair market value of Manchester's inventory, Judge Selna erred in concluding that Donahue's reliance on Caltrans's counsel's assertedly incorrect instructions to value the inventory as a bulk sale and at wholesale rendered Donahue's testimony excludable as based on a method inconsistent with the legal standard for determining fair market value.

(b)

*Donahue's Opinion Testimony was Consistent*
*with Legal Valuation Standard*

"Valuation methods differ with the nature of the business and the purpose for which the evaluation is conducted." (*People ex rel. Dept. of Transportation v. Leslie, supra,* 55 Cal.App.4th at p. 923.) The Eminent Domain Law provides: "Compensation shall be awarded for the property taken. The measure of this compensation is the fair market value of the property taken." (Code Civ. Proc., § 1263.310.) The Eminent Domain Law

also provides: "The fair market value of property taken for which there is no relevant, comparable market is its value on the date of valuation as determined by any method of valuation that is just and equitable." (*Id.*, § 1263.320, subd. (b).) Similarly, Evidence Code section 823 provides: "[T]he value of property for which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable."

 Donahue testified he was assigned to determine the highest fair market value between a willing buyer and a willing seller of Manchester's business inventory as of the date of valuation; such assignment included a legal instruction to value the inventory as a bulk sale rather than individual sales; and the assignment also included a legal instruction to determine a fair market value based on the inventory's wholesale cost or price through removal of the "future consideration" of profit.

In *McMahan's, supra,* 146 Cal.App.3d 683, the appellate court approved a standard for evaluating the fair market value of retail inventory using wholesale value based upon replacement cost. (*Id.* at p. 701.) At the foundational hearing here, Donahue testified that since he was unaware of any precise methodology on how to assign a fair market value to auto parts inventory, he developed a specific methodology for appraising Manchester's business inventory based on its "wholesale costs," "wholesale price," or "wholesale value." From books, courses and conversations with business valuation appraisers and brokers about how inventory is valued, Donahue believed that with respect to the sale and purchase of a business, wholesale cost was the way inventory was bought and sold on the open market. Donahue also believed it was difficult to ascertain the wholesale value of auto parts inventory such as Manchester's because an appraiser could not simply "call around" to find the wholesale cost of an auto part since such items were typically dismantled from cars and there was "no set cost." Similarly, Manchester's appraiser Crockett ultimately testified at trial that there was "no such thing as a wholesale price" throughout the "industry." Further, Donahue's methodology of determining a inventory item's retail price, including Manchester's costs of acquisition/preparation for resale, and then deducting a profit markup to reach a wholesale price, was not inconsistent with California law as set forth in *McMahan's.* Hence, we cannot say that Donahue's method was facially unjust or inequitable. (*People ex rel. Dept. of Transportation v. Leslie, supra,* 55 Cal.App.4th at p. 923; Code Civ.

Proc., §§ 1263.310, 1263.320, subd. (b); Evid. Code, § 823; see *County Sanitation Dist. v. Watson Land Co., supra*, 17 Cal.App.4th at p. 1282.)[14]

Moreover, since by stipulation Manchester had been compensated for all other components of the business taken in its entirety by Caltrans, Donahue's determination of the bulk fair market value of Manchester's inventory in the context of a sale of the entire business by a willing seller to a willing buyer was not facially unjust, inequitable or otherwise proscribed by law.[15] Indeed, Manchester's inventory appraiser Crockett ultimately testified at trial that if a buyer went into Manchester's business and said he was willing to buy the entire inventory, such buyer "probably would not" pay retail prices to a willing seller.[16] Thus, whether the specific circumstances of Manchester's business warranted application of Donahue's methodology was a factual question for the jury. However, although any "just and equitable" method could be proper, the jury would remain "free to accept or reject" Donahue's valuation. (*People ex rel. Dept. of Transportation v. Leslie, supra*, 55 Cal.App.4th at p. 923.)

In sum, in assigning Donahue to appraise the fair market value of Manchester's business inventory as of the date of valuation, Caltrans properly told Donahue to determine the highest fair market value between a willing buyer and a willing seller. Further, Caltrans's counsel also properly instructed Donahue to value the inventory as a bulk sale and at wholesale. Caltrans's counsel's instruction to Donahue was consistent with California law. Although based upon facts differing in some respects from those here, *McMahan's, supra*, 146 Cal.App.3d 683, established that valuing retail

---

[14]In *County Sanitation Dist. v. Watson Land Co., supra*, 17 Cal.App.4th 1268, the appellate court noted: "Where an expert in a condemnation action employs a methodology not sanctioned by California law, his opinion may be excluded." (*Id.* at p. 1282.) Unlike the situation in *County Sanitation Dist.*, the wholesale valuation standard employed by Donahue was not proscribed by California law.

[15]"The evidence need not show the existence of an actual seller and buyer, or the existence of an actual market. A showing of potential sellers and buyers in a potential market will suffice." (*South Bay Irr. Dist. v. California-American Water Co.* (1976) 61 Cal.App.3d 944, 970 [133 Cal.Rptr. 166].) Further, the "weight to be given a method or approach to an opinion or determination of market value should be considered in the light of the views of the hypothetical buyer and seller respecting the results from the use of that method or approach and the factors considered in applying it to the circumstances at hand [citations]." (*Id.* at p. 974.)

[16]Caltrans acknowledges that since Manchester's salvage auto parts had been enhanced in value by refurbishment, Donahue properly considered such enhanced value as would a prospective buyer. However, Caltrans contends any higher potential value resulting from retail sales of the refurbished items could not properly be considered as a measure of fair market value because inclusion of retail value would impermissibly result in a windfall to Manchester. (*McMahan's, supra*, 146 Cal.App.3d at p. 700.)

inventory at wholesale in the context of a bulk sale was within the bounds of proper appraisal methodology. Caltrans's instruction to Donahue was also consistent with the eventual trial testimony of Manchester's inventory appraiser Crockett that a willing buyer of the entirety of Manchester's inventory would likely pay a price less than retail. Moreover, although the record suggests Judge Selna was primarily concerned that Caltrans might have instructed Donahue to come to a conclusion he would not have otherwise reached, Donahue's own testimony indicated the contrary. Specifically, Donahue testified to his own belief based upon sources independent of Caltrans that inventory was typically bought and sold at wholesale cost when an entire business was transferred. Hence, since Caltrans's counsel's legal instructions to Donahue were not erroneous and Donahue did not use a valuation methodology proscribed by law, we conclude Judge Selna abused his discretion to the extent he excluded the entirety of Donahue's testimony as based upon those legal instructions. (Cf. *Ventura County Flood Control Dist. v. Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1004 [93 Cal.Rptr. 653] ["Where it appears that the opinion of a valuation witness is based upon considerations which are proper as well as those which are not, the testimony may be admitted and the trier of fact shall determine its weight."]; *County Sanitation Dist. v. Watson Land Co.*, *supra*, 17 Cal.App.4th at p. 1282; *Korsak v. Atlas Hotels, Inc.*, *supra*, 2 Cal.App.4th at pp. 1522-1523; *South Bay Irr. Dist. v. California-American Water Co.*, *supra*, 61 Cal.App.3d at p. 984; *San Bernardino County Flood Control Dist. v. Sweet* (1967) 255 Cal.App.2d 889, 902 [63 Cal.Rptr. 640].)

2

*Adequate Evidentiary Foundation for Donahue's
Proffered Valuation Testimony*

On this record we conclude the court (Judge Selna) also abused its discretion to the extent it excluded the entirety of Donahue's testimony on the ground of insufficient evidentiary foundation. (*Korsak v. Atlas Hotels, Inc.*, *supra*, 2 Cal.App.4th at pp. 1522-1523.)

As discussed, Donahue testified he arrived at his valuation opinion by determining the retail value of the inventory items based in part upon Manchester's costs with respect to those items, removing a 50 percent profit markup from such retail value to reach the wholesale value, deducting for the percentage of items that would not sell, applying a liquidation price to those items, and then adding that liquidation value to the downward adjusted

wholesale value to get to the fair market value. In excluding Donahue's testimony, the court stated there was an insufficient evidentiary foundation for Donahue's valuation opinion, particularly with respect to removing from the inventory items' retail price a 50 percent markup based upon conversations with unidentified distributors and dealers about practices in unidentified industries. However, Donahue's testimony at the foundational evidentiary hearing provided an adequate foundation for his opinion of the fair market value of Manchester's inventory.

Evidence Code section 801 limited Donahue's expert opinion testimony on the value of Manchester's business inventory to an opinion based on matter "of a type that reasonably may be relied upon by experts in forming an opinion upon the subject to which his testimony relates. In large measure, this assures the reliability and trustworthiness of the information used by experts in forming their opinions." (Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 801, p. 21.)[17] ■ "Although the courts have rejected expert opinions '[w]here the basis of the opinion is unreliable hearsay,' . . . nevertheless, hearsay information of a type *reasonably relied upon* by professionals in the field in forming an opinion on the subject may be used to support an expert opinion, even though not admissible in court. . . ." (*Korsak v. Atlas Hotels, Inc., supra*, 2 Cal.App.4th at p. 1524, citations omitted.)

■ Donahue testified he read books, attended courses and conversed with business valuation appraisers and brokers to determine how inventory was sold. Donahue also testified that based upon conversations with "six or eight different distributors and dealers" about the "typical markup" and as consistent with teachings in business school, he removed from the retail price of Manchester's inventory items a "keystone markup" of 50 percent as the assumed profit. In general, experts may reasonably rely on such sources in forming their opinions. However, the "reasonableness of an expert's reliance is a question of degree, and may well vary with the circumstances." (*Buckwalter v. Airline Training Center* (1982) 134 Cal.App.3d 547, 553-554 [184 Cal.Rptr. 659].) As discussed, appraisal of salvage auto parts indisputably presented a challenge as devoid of any precisely prescribed method for

---

[17]Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

valuing such inventory items. Further, although the court faulted Donahue for not identifying the distributors and dealers he consulted about removing the retail markup and not identifying the industries they considered, Donahue's testimony was given at a foundational evidentiary hearing where the court had stated it wanted Caltrans to put on only "in abbreviated fashion" its "prima facie valuation case." Under these circumstances, before excluding Donahue's entire testimony for its lack of specificity with respect to the identities of sources and industries, the court should have, at a minimum, asked Caltrans for an offer of proof. Moreover, in any event, such lack of specificity in Donahue's testimony simply affected the testimony's weight and could have been probed in cross-examination at trial. (*Ventura County Flood Control Dist. v. Security First Nat. Bank, supra*, 15 Cal.App.3d at p. 1004; *San Bernardino County Flood Control Dist. v. Sweet, supra*, 255 Cal.App.2d at p. 902.)

On this record the jury was entitled to weigh the import and credibility of Donahue's testimony about the "keystone markup" of 50 percent above wholesale cost. (*Buckwalter v. Airline Training Center, supra*, 134 Cal.App.3d at pp. 553-554.)[18] Accordingly, since Donahue's opinion testimony about the fair market value of Manchester's business inventory was founded upon matters sufficient to form a proper basis for such opinion, we conclude Judge Selna abused his discretion in excluding such testimony. (*Korsak v. Atlas Hotels, Inc., supra*, 2 Cal.App.4th at pp. 1522-1524.)

3

*Conclusion*

The superior court erroneously held the testimony of Caltrans's inventory appraiser Donahue to be inadmissible for purposes of establishing the fair market value of Manchester's business inventory. "It is prejudicial error to exclude relevant and material expert evidence where a proper foundation for it has been laid, and the proffered testimony is within the proper scope of expert opinion." (*Korsak v. Atlas Hotels, Inc., supra*, 2 Cal.App.4th at p. 1523.) Thus, the judgment must be reversed.

---

[18]In *Buckwalter v. Airline Training Center, supra*, 134 Cal.App.3d 547, we observed: "Where, as here, there is little or no direct evidence upon which the expert can base an opinion, the expert may have to turn to forms of circumstantial evidence on which he might not otherwise rely. In such circumstances, the necessity for the information dictates that courts accord to experts somewhat greater latitude in sources of information than might otherwise be the case." (*Id.* at p. 554.)

## IV

### DISPOSITION

The judgment and order are reversed. Respondent shall have costs on appeal. (Code. Civ. Proc., § 1268.720.)

Benke, J., and O'Rourke, J., concurred.

Respondent's petition for review by the Supreme Court was denied May 1, 2002.