Filed 2/8/23  Solisdecastelli v. Superior Court CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JUAN MANUEL SOLISDECASTELLI,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>    Defendant and Respondent,<br><br>STEVE GORDON, as Director, etc.,<br><br>    Real Party in Interest and Respondent. | B317021<br><br>(Los Angeles County Super. Ct. No. 20STCP03438) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Markelz Law Group and Christopher Markelz for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Rob Bonta, Attorney General, Chris A. Knudsen, Assistant Attorney General, Nancy G. James and Lorinda D. Franco, Deputy Attorneys General, for Real Party in Interest and Respondent.

* * * * * *

Juan Manuel Solisdecastelli (appellant) appeals from a trial court judgment denying his petition for writ of mandate challenging the Department of Motor Vehicle's (DMV) suspension of his noncommercial driver's license and disqualification of his commercial driver's license.[1]  Following a DMV administrative per se (APS) hearing, appellant filed a writ petition in the superior court.  Appellant appeals from the trial court's denial of the petition, arguing that the DMV violated his due process rights by carrying out the APS hearing in a proceeding deemed unconstitutional in *California DUI Lawyers Assn. v. Department of Motor Vehicles* (2022) 77 Cal.App.5th 517 (*California DUI Lawyers*) and that substantial evidence did not support the trial court's findings.  We find no reversible error and affirm the judgment.

## FACTUAL BACKGROUND

At approximately 12:45 a.m. on December 21, 2019, Los Angeles County Sheriff's Deputy Treadway observed a Toyota

---

[1]     Respondent Steven Gordon is the director of the DMV and was named in this lawsuit in his official capacity.

driving directly in front of him on the 101 freeway. The Toyota swerved into the lane to its left, then swerved into the lane to its right, before swerving back into its original travel lane. Deputy Treadway conducted a traffic stop of the vehicle for violation of Vehicle Code section 21658, which requires that a vehicle be driven in a single lane until movement from the lane can safely be made.

Appellant was the driver and sole occupant of the vehicle. Deputy Treadwell smelled a strong odor of alcohol on appellant's breath. Deputy Treadway observed appellant's slurred speech and bloodshot, watery eyes. Appellant displayed unsteady coordination and a swaying movement upon exiting the vehicle. Appellant told Deputy Treadway that he drank two 20-ounce beers between 8:00 p.m. and 9:00 p.m.

Deputy Treadway conducted a series of field sobriety tests on which appellant performed poorly. Appellant's eyes jerked during the horizontal gaze nystagmus test. During the walk and turn test, appellant stopped walking after taking just three steps during the first part of the test, then could not keep his balance. During the one leg stand test, appellant swayed, hopped up and down and put down his left foot three times. During the finger to nose tests, appellant touched his upper lip instead of his nose four out of six times.

Deputy Treadway administered two preliminary alcohol screening (PAS) tests. He used a Lifeloc FC20 Breath Alcohol Tester. The first screening took place at 1:04 a.m. and recorded a result of 0.1631 percent blood alcohol concentration (BAC). The second test, taken at 1:06 a.m., recorded a result of 0.1591 percent BAC.

3

Deputy Treadway concluded that appellant was driving under the influence of alcohol and arrested him at approximately 1:06 a.m.

For the evidentiary chemical breath test, a DataMaster DMT Intoximeter No. 300110 was used.  Deputy Treadway administered the tests.  Appellant's two breath tests taken at 1:43 a.m. and 1:46 a.m. each yielded results of 0.19 percent BAC.

## PROCEDURAL HISTORY

### APS Hearing

The APS hearing was on June 9, 2020, July 16, 2020, August 24, 2020, and September 30, 2020.[2]  The hearing officer began the hearing setting forth the issues to be determined at the hearing.  The issues were: "Did the peace officer have reasonable cause to believe the [appellant] was driving a motor vehicle in violation of Section 23152 or Section 23153 of the California Vehicle Code; was the [appellant] lawfully arrested; was the [appellant] driving a motor vehicle with 0.08 percent BAC or more by weight of alcohol?"  Admitted into evidence was Deputy Treadway's written sworn statement, the arrest report and appellant's driving record.  The hearing officer also admitted into evidence three exhibits offered by appellant: a Federal Register

---

[2]    ""Under the administrative per se law, the DMV must immediately suspend the driver's license of a person who is driving with .08 percent or more, by weight, of alcohol in his or her blood.  ([Veh. Code,] § 13353.2, subd. (a)(1).)  The procedure is called 'administrative per se' because it does not impose criminal penalties, but simply suspends a person's driver's license as an administrative matter upon a showing the person was arrested for driving with a certain blood-alcohol concentration . . . .""" (*California DUI Lawyers, supra*, 77 Cal.App.5th at p. 525.)

4

notice pertaining to performance criteria and methods for testing evidential breath test devices that measure alcohol content; an article authored by appellant's expert Okorie Okorocha; and Okorocha's May 19, 2020 declaration in which he concluded appellant's BAC was approximately 0.05 percent at the time of the PAS test and 0.06 percent at the time of the evidential test since appellant was in the absorption phase and his blood alcohol level was still rising.

Appellant was allowed to present his case.

### *Okorocha testimony*

Appellant called his expert Okorocha, a forensic toxicologist, who opined that appellant was driving with a BAC below 0.08 percent and that the chemical breath test results were inaccurate. Okorocha testified:

> "So, he was pulled over at 12:45 a.m. on December 21st, 2019. And he was later given a preliminary breath test, preliminary alcohol screening test, at 1:04 and 1:06. So that's—there's a 20-minute gap there that he had to absorb.

> "Also, I believe he indicated that he had been drinking up until, I believe, it was 40 minutes before he was pulled over. But either way, we note that the PAS results that he had was a 1.5—0.15 and later, about 40 minutes later, he had a BAC of 0.19. So this is a text book definition of rising blood alcohol."

Okorocha explained that the rising blood alcohol was significant because it meant appellant was in the absorption phase, during which breathalyzers read falsely high by two to three times. Okorocha opined during this phase, a 0.03 reads as a 0.09 and a 0.05 reads as a 0.15 and a 0.06 reads as a 0.18. Okorocha relied on several resources, including scientific journal articles, which explain that "you have to wait two hours after the

person is finished drinking to do a breath test to get an accurate result." Okorocha stated that it was widely accepted that "the breath test reads falsely high during the absorption phase." Okorocha added that since appellant's PAS test, conducted 40 minutes before his evidential test, was significantly lower, appellant had to be in the absorptive phase.

The hearing officer asked Okorocha to identify the evidence that reflected appellant had stopped drinking 40 minutes before he was stopped. Okorocha first said it was the police report, but then was unable to locate the evidence. When asked if his opinion would change based on the information in the police report that appellant stopped drinking at 9:00 p.m., Okorocha stated:

> "[I]f that's true, so be it, but it would have zero effect on my opinion. Because we know conclusively that he was absorbing and rising, and that's the only issue in this case. Even if he said he never drank in his life, or he said he drank a gallon of whiskey two minutes ago, it wouldn't matter. His BAC was going up regardless."

Okorocha testified that there was not an average absorption rate, and that it can take up to five hours for someone to fully absorb.

Neither Deputy Treadway's sworn statement nor the sheriff's report reflected that appellant had stopped drinking 40 minutes before he was pulled over.

### Treadway testimony

Appellant called and examined Deputy Treadway as a witness. Deputy Treadway was trained in DUI investigations and field sobriety testing. At 12:45 a.m. on December 21, 2019, Deputy Treadway stopped appellant after observing appellant failing to maintain his lane of travel. After pulling over

6

appellant, Deputy Treadway observed appellant's bloodshot and watery eyes and signs of alcohol impairment. Deputy Treadway administered five field sobriety tests. He determined that appellant was impaired based on the totality of the circumstances, testifying that the clues were consistent in suggesting appellant was impaired.

### *Apodaca testimony*

Juan Apodaca, a senior criminologist for the Forensic Alcohol Section of the Los Angeles County Sheriff's Department, opined that appellant's BAC was higher than 0.08 percent at the time appellant was driving. Apodaca explained that he used the process of retrograde extrapolation, which is a calculation to determine what a person's BAC could have been at an earlier time based on an evidentiary blood or breath test. Apodaca calculated that appellant's BAC at the time of driving was anywhere between 0.19 percent and 0.21 percent, but likely closer to 0.21 percent. Apodaca's calculation was based on appellant's time of drinking, time of driving, timing and results of the evidentiary chemical breath tests, and appellant's testimony that he drank two beers. Apodaca thought it impossible that appellant's BAC was lower than 0.19 percent at the time of driving, since his last drink was at 9:00 p.m., as by the time he was driving at 12:45 a.m., he was already eliminating the alcohol or plateauing.

When asked if the variations from the PAS tests taken before the evidentiary breath tests changed his opinion, Apodaca said they did not. He explained that for variations to be significant, the results must come from the same instrument. Apodaca explained that there could be variation between different instruments, and thus it was not troubling to him that the two machines measured appellant's BAC differently.

7

Part of Apodaca's duties of employment as a criminologist was to maintain the working order of the DataMaster DMT device. He reviewed the data record in appellant's case, the PAS record, the maintenance record and the instrument usage record, and determined that the breathalyzer used to conduct appellant's chemical breath tests was calibrated and properly functioning.

**APS hearing decision**

The hearing officer issued a "Notification of Findings and Decision" on October 16, 2020, finding that Deputy Treadway carried out a lawful arrest based on the totality of circumstances including appellant's swerving out of his lane of travel, bloodshot and watery eyes, unsteady gaze, poor performance on field sobriety tests, the odor of alcohol, appellant's admission to having consumed alcohol, and the PAS test results.

The hearing officer found that the testimony of appellant's expert, Okorocha, was not credible, noting that Okorocha testified that appellant's BAC was rising based in part on the fact that appellant had been drinking up until 40 minutes before he was pulled over, without support for that information being identified. Thus, Okorocha's opinion on appellant's drinking pattern was not based on the evidence. When asked whether appellant's statement that he stopped drinking at 9:00 p.m. would have had an effect on his opinion, Okorocha observed, "it would have zero effect on my opinion. Because we know conclusively that he was absorbing and rising . . . ." The hearing officer declined to credit this opinion.

The hearing officer also found that Okorocha's testimony was inconsistent, noting he testified on direct examination that alcohol can be fully absorbed two hours after a person stops drinking, while on cross-examination he testified it can take up to five hours to fully absorb the alcohol.

8

The hearing officer credited the rebuttal testimony of Apodaca, who used a retrograde extrapolation calculation to estimate that appellant's BAC at the time of driving was between 0.19 percent and 0.21 percent. The hearing officer concluded there was sufficient evidence that appellant's BAC was 0.08 percent or higher at the time of driving.

On October 16, 2020, the DMV re-imposed the suspension of appellant's driving privileges effective October 25, 2020, through February 24, 2021. Based on the same facts and decision, the DMV issued an order of disqualification, which disqualified appellant from being a licensed commercial driver effective October 26, 2020, through October 25, 2021.

**Writ proceedings**

On October 21, 2020, appellant filed a petition for writ of mandate seeking to set aside the DMV's suspension and disqualification orders. The matter was heard on October 1, 2021, and taken under submission.

On October 4, 2021, the trial court issued a written ruling denying appellant's petition. The court incorporated by reference its 10-page order denying petition for peremptory writ of mandamus, which set forth the standard requiring the court to "exercise its independent judgment to determine whether the weight of the evidence supports the administrative decision." (Citing *Morgenstern v. Department of Motor Vehicles* (2003) 111 Cal.App.4th 366, 372 (*Morgenstern*).) The court noted that it had the "power and responsibility" to weigh the evidence and make its own credibility determinations. The court quoted *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*), for the proposition that "[i]n exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the

administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence."

The court noted that Vehicle Code section 23152, subdivision (b) provides a "rebuttable presumption" that a person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of driving "if the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of the performance of a chemical test within three hours after the driving." The trial court found that Okorocha's testimony rebutted the presumption found in Vehicle Code section 23152, subdivision (b). Thus, the DMV was required to prove appellant's BAC at the time of driving without the benefit of the presumption.

The court found that Okorocha's testimony was entitled to little, if any, weight, describing it as "incomplete and therefore unpersuasive." The court explained that Okorocha's testimony "appear[ed] to be based upon an incorrect understanding of the underlying facts." For example, Okorocha's opinion of appellant's rising BAC does not explain the reduction in BAC from the first PAS test to the second PAS test, although the tests were only two minutes apart. These tests did not show a rising BAC, but the opposite. More importantly, the court noted that Okorocha based his opinion on his mistaken understanding that appellant had stopped drinking only 40 minutes before being stopped by Deputy Treadway. However, the only evidence concerning the time appellant stopped drinking was from appellant himself, who said that he stopped drinking three hours and 45 minutes prior to being stopped by Deputy Treadway and more than four hours before his PAS tests. The court found Okorocha's response to this discrepancy insufficient and ultimately undermined the value of

10

his opinion.  The court also found Okorocha's response to be "at odds with his testimony accurate testing requires a two-hour delay between drinking and testing."

The court then explained that based on all the evidence in the record, the DMV's decision was supported by the weight of the evidence.  The court pointed to Deputy Treadway's observations of appellant's driving behavior and objective signs of intoxication; appellant's admission to drinking two 20-ounce beers before driving; his poor performance on the field sobriety tests and the fact that all four breath tests taken by appellant showed a BAC of greater than 0.08 percent.

The court also found Apodaca's testimony to be credible, placing appellant's BAC between 0.19 percent and 0.21 percent at the time he was driving.

**Notice of appeal**

On December 9, 2021, appellant filed a notice of appeal from the order denying his petition for writ of mandate.

## DISCUSSION

### I. Applicable law and standard of review

The trial court was required to exercise its independent judgment to determine whether the weight of the evidence supported the DMV's decision.  (*Morgenstern, supra*, 111 Cal.App.4th at p. 372.)  In exercising its independent judgment, the trial court correctly afforded "a strong presumption of correctness concerning the administrative findings."  (*Fukuda, supra*, 20 Cal.4th at p. 817.)[3]

---

[3]     We reject appellant's argument that the trial court erred in applying the presumption of correctness concerning the administrative findings.  The cases cited by appellant do not so

11

On appeal from a trial court's decision on a petition for writ of mandate, we are bound to uphold the decision if it is supported by substantial evidence. (*Coffey, supra*, 60 Cal.4th at p. 1217.) Under this standard, we "resolve all conflicts in favor of the DMV, as the party prevailing in the superior court, and give it the benefit of all reasonable inferences in support of the judgment." (*Hildebrand v. Department of Motor Vehicles* (2007) 152 Cal.App.4th 1562, 1568.) "'"'We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings.'"'" (*Ibid.*) However, we exercise de novo review of legal issues. (*Morgenstern, supra*, 111 Cal.App.4th at p. 372.)

## II. Effect of *California DUI Lawyers*

On April 15, 2022, Division Four of this court rendered its opinion in *California DUI Lawyers*. The *California DUI Lawyers* court held that the DMV's APS hearing structure violates the California and federal due process rights of drivers by combining the advocacy and adjudicatory roles into a single DMV employee. (*California DUI Lawyers, supra*, 77 Cal.App.5th at p. 531.) The *California DUI Lawyers* decision explained that at a DMV APS hearing, such as the one in which appellant participated, "the DMV mandates that the hearing officers simultaneously act as

---

hold. (See *Coffey v. Shiomoto* (2015) 60 Cal.4th 1198 (*Coffey*); *Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392; *Lake v. Reed* (1997) 16 Cal.4th 448.) *Fukuda* made it clear that "a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda, supra,* 20 Cal.4th at p. 817.)

12

advocates for the DMV and as triers of fact. The DMV also authorizes its managers to change hearing officers' decisions, or order the hearing officers to change their decisions, without notice to the driver." (*Id.* at p. 523.) Based on these practices, the California DUI lawyers' association sued the DMV and its director for injunctive and declaratory relief, alleging that "both the lack of a neutral hearing officer, and the ex parte communications between DMV managers and hearing officers, violate drivers' rights to procedural due process . . . ." (*Ibid.*)

The *California DUI Lawyers* court found that the APS hearing officer's dual roles as advocate and adjudicator creates an unacceptable risk of bias by combining the advocacy and adjudicatory roles into a single DMV employee. (*California DUI Lawyers, supra*, 77 Cal.App.5th at p. 530.) The court cited several cases that stand for the proposition that "[a]lthough procedural fairness does not prohibit the combination of the advocacy and adjudicatory functions within a single administrative agency, tasking the same individual with both roles violates the minimum constitutional standards of due process." (*Id.* at p. 532.) The *California DUI Lawyers* court ordered the trial court to modify its judgment to state "the DMV is permanently enjoined and restrained from having its APS hearing officers function as advocates for the position of the DMV in addition to being finders of fact in the same adversarial proceeding." (*Id.* at p. 538.)

Appellant states that his APS hearing took place under the same system *California DUI Lawyers* held violates due process. As at all APS hearings, the hearing officer stated the issues, introduced the DMV's evidence, ruled on evidentiary objections to evidence, and cross-examined appellant's witness. There was no other DMV employee involved in the hearing process. The DMV

13

does not dispute that appellant's proceeding took place under the same procedures held unconstitutional in *California DUI Lawyers*.

### A. *Retroactivity*

Appellant encourages this court to hold that *California DUI Lawyers* should be applied retroactively to this matter.[4] Appellant cites *People v. Carrera* (1989) 49 Cal.3d 291, 327 for the general rules regarding retroactive application of new standards:

> "'Whether a judicial decision establishing new . . . standards is to be given retroactive effect is customarily determined by weighing the following factors: ["](a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of retroactive application of the new standards." [Citations.] . . . Decisions have generally been made fully retroactive only where the right vindicated is one which is essential to the integrity of the fact-finding process. On the other hand, retroactivity is not customarily required when the interest to be vindicated is one which is merely collateral to a fair determination of guilt or innocence.'"

Appellant argues that due to the hearing officer's dual role of advocate for the DMV and trier of fact, the integrity of the fact-

---

[4] The DMV argues that appellant has waived any challenge premised on the officer's dual role examined in *California DUI Lawyers*. We decline to find waiver, as *California DUI Lawyers* created an unforeseen change in the law. (See *People v. Perez* (2020) 9 Cal.5th 1, 10 ["[A] defendant need not predict subsequent substantive changes in law in order to preserve objections."].)

14

finding process was compromised. Thus, appellant argues, this court should give full retroactive effect to the *California DUI Lawyers* decision.

Appellant relies on *Volkswagen of America v. New Motor Vehicle Board* (July 18, 1985, A012279) [1985 Cal.App. Unpub.Lexis 1] (nonpub. opn.) (*Volkswagen*). *Volkswagen* is not a published case and therefore we may not rely on it as binding authority.[5] Regardless, we note that the case is distinguishable. *Volkswagen* involved the appellant's contention that "the statutory scheme providing a lopsided representation on the [DMV's New Motor Vehicle] Board for the new motor vehicle dealers without any representation for the manufacturers is constitutionally defective and deprives the manufacturer-litigants of an impartial tribunal." (*Id.* at p. 2.) The tribunal in question had nine members. Four of the members were required to be new car dealers, and the remaining five members were required to be of the general public, with no provision whatsoever for manufacturers to also be represented on the Board. (*Id.* at pp. 4-5.) The *Volkswagen* court agreed that the disparity of representation created a likelihood of bias, pointing out that recent cases had held the contested portions of the statute to be constitutionally infirm. The *Volkswagen* court determined that the recent decisions must be given retroactive effect because they went "to the heart of the fact-finding process." (*Id.* at p. 6.)

---

[5] According to the case docket, an order granting publication was dated August 23, 1985, which would have been beyond the 30-day jurisdiction following the opinion of July 18, 1985. On September 3, 1985, a letter was sent to the Supreme Court recommending publication of the opinion. However, the Supreme Court denied it on December 26, 1985.

*Volkswagen* is factually distinguishable in that the car dealers on the board possessed a pecuniary interest in the franchise disputes. (*Volkswagen, supra*, A012279 [1985 Cal.App. Unpub.Lexis at p. 5].) Thus, the car dealers had "a right in the decision-making process despite their financial interest in the outcome of that process." (*Id.* at p. 4.) When the factfinder has a pecuniary interest in the outcome of the proceedings, bias is assumed. The Supreme Court has held that "it certainly violates the Fourteenth Amendment and deprives a defendant . . . of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." (*Tumey v. State of Ohio* (1927) 273 U.S. 510, 523.) This is not the situation in the DMV cases, where there is no contention that the hearing officer has a pecuniary interest in the matter. Further, the *Volkswagen* court recognized that there are exceptions to the general rule of retroactivity where "consideration of fairness or public policy militate against full retroactivity." (*Volkswagen, supra*, A012279 [1985 Cal.App. Unpub.Lexis at p. 5].)

One such exception exists where a party properly relies on settled legal authority. "'Although as a general rule judicial decisions are to be given retroactive effect [citation], there is a recognized exception when a judicial decision changes a settled rule on which the parties below have relied.'" (*Claxton v. Waters* (2004) 34 Cal.4th 367, 378.) Considerations relevant to this determination are the ""reasonableness of the parties' reliance on the former rule, the nature of the change as substantive or procedural, retroactivity's effect on the administration of justice, and the purposes to be served by the new rule."'" (*Id.* at pp. 378-379.)

The DMV argues that the considerations of fairness and justice dictate against a finding of retroactive application in this case, explaining that the APS procedure has been in effect for more than 30 years to determine whether to temporarily suspend a driver's license following an arrest for drunk driving. (*Anderson v. Cozens* (1976) 60 Cal.App.3d 130, 140 [noting that "it is now well settled that the statutory scheme and procedures employed by the DMV . . . satisfy procedural due process requirements"]; *Finley v. Orr* (1968) 262 Cal.App.2d 656, 666 [rejecting the argument that petitioner was denied a fair hearing because the DMV acted as both the accuser and the judge].) In 1995, an appellate court expressly held that the hearing officer's role as "an employee of the Department and a proponent of evidence" did not violate due process. (*Poland v. Department of Motor Vehicles* (1995) 34 Cal.App.4th 1128, 1134-1135.) Thus, the DMV argues, it properly relied on settled authority supporting the constitutionality of the APS process.

The DMV explains that the Legislature created the APS procedure to address "the time lag that often occurs between an arrest and a conviction for driving while intoxicated or with a prohibited blood-alcohol concentration." (*MacDonald v. Gutierrez* (2004) 32 Cal.4th 150, 155.) This expedited administrative procedure keeps "arrestees who would eventually be convicted of an intoxication-related driving offense" off the road in the interim period and prevents them from "escap[ing] license suspension or revocation by plea bargaining to lesser crimes or entering pretrial diversion." (*Ibid.*) The DMV asserts that the APS system was working well to keep our roads safer by taking drunk drivers off the road.

The DMV makes a compelling argument that *California DUI Lawyers* should not be applied retroactively based on public

17

policy and the potential for public harm.  However, we find that we need not decide whether to apply *California DUI Lawyers* retroactively, as any constitutional error would be harmless in this case.

**B.** *Harmless error*

Typically, a party that has established error "must demonstrate there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result." (*People v. Anzalone* (2013) 56 Cal.4th 545, 553.) However, """under the California constitutional harmless-error provision some errors . . . are not susceptible to the 'ordinary' or 'generally applicable' harmless-error analysis."" (*Ibid.*)  In the context of criminal law, such errors ""all involve fundamental 'structural defects' in the judicial proceedings."" (*Ibid*; see *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.)  Examples of such structural error requiring automatic reversal include complete denial of counsel; biased trial judge; racial discrimination in selection of jury; denial of self-representation at trial; denial of public trial; and defective reasonable-doubt instructions. (*Washington v. Recuenco* (2006) 548 U.S. 212, 218, fn. 2.)  However, "[t]here is a strong presumption that any error falls within the trial error category, and it will be the rare case where a constitutional violation will not be subject to harmless error analysis." (*Anzalone, supra*, at p. 554; see *Monier, supra*, at p. 1108.)  This is also true in the context of administrative proceedings. (*Malaga County Water Dist. v. Central Valley Regional Water Quality Control Bd.* (2020) 58 Cal.App.5th 418, 445 [noting that due process violations in the administrative law context "are, absent exceptional circumstances, subject to a harmless error analysis when a violation is found"].)

18

While bias of a trial judge may be considered structural error in some circumstances, we note that appellant is not claiming actual bias in this matter. Instead, appellant argues that the dual role of the hearing officer created the theoretical possibility of bias in the hearing. In the administrative context, "a party claiming that the decision maker was biased must show actual bias, rather than the appearance of bias, to establish a fair hearing violation." (*Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 549.) The *Southern* court explained, "'[B]ias in an administrative hearing context can never be implied, and the mere suggestion or appearance of bias is not sufficient.'" (*Ibid.*) Because appellant is not claiming actual bias, any constitutional error is subject to the harmless error analysis.

Under the harmless error standard, appellant must establish that there was a "reasonable probability of a more favorable result." (*Margarito v. State Athletic Com.* (2010) 189 Cal.App.4th 159, 173.) We find that appellant has failed to demonstrate that he would have obtained a different result under a different procedure. There is no suggestion that the hearing officer engaged in any biased conduct. Instead, the record shows that the officer elicited testimony, asked straightforward questions, and provided appellant ample opportunity to present his case. In addition, the hearing officer's decision shows that she considered all the parties' properly admitted evidence and came to a reasonable conclusion based on her careful consideration of that evidence. As set forth below, the evidence overwhelmingly supports the hearing officer's conclusion that appellant was driving with a BAC of 0.08 percent or higher.

## III. Substantial evidence supports the trial court's findings

In a case where expert testimony rebuts the presumption in Vehicle Code section 23152, subdivision (b) that a driver had a BAC at the time of driving of 0.08 percent or higher, the DMV must prove the driver's BAC at the time of driving without resorting to the presumption. (*Coffey, supra*, 60 Cal.4th at pp. 1210-1211.) Substantial evidence supports the trial court's factual findings that the DMV proved that appellant's BAC was greater than 0.08 percent without the benefit of the presumption.

Four breath tests were administered after appellant was stopped. The first two yielded results of 0.1591 percent and 0.1631 percent. The second two, administered approximately 40 minutes later, yielded results of 0.19 percent. All four breath tests yielded results well over 0.08 percent. Fact finders may rely on breath tests, the validity of which has been accepted for many years. (*McKinney v. Department of Motor Vehicles* (1992) 5 Cal.App.4th 519, 525.) This evidence alone constitutes substantial evidence that appellant was driving with a prohibited BAC level.

The trial court was also entitled to rely on the corroborating evidence of Deputy Treadway. (*Coffey, supra*, 60 Cal.4th at p. 1216 [finding "circumstantial evidence that plaintiff was weaving erratically all over the roadway, smelled strongly of alcohol, and failed a battery of field sobriety tests may bolster chemical test results showing that [a driver] had attained or exceeded [the 0.08 percent] BAC level"].)[6] Deputy Treadway

---

[6] We reject appellant's argument that "the trial court should not have inferred the DMV relied on anything other than the three-hour presumption." The DMV's decision sets forth the

observed appellant swerving in and out of lanes.  Upon stopping appellant, Deputy Treadway observed that appellant had bloodshot and watery eyes, a strong odor of alcohol, and unsteady coordination.  Appellant also failed multiple field sobriety tests, which Deputy Treadway documented contemporaneously.  Appellant's eyes jerked and started to bounce around during the horizontal nystagmus test.  During another test, appellant inaccurately measured the passage of 30 seconds.  During the walk and turn test, appellant stopped walking after just three steps during the first part of the test, and then could not keep his balance.[7]  During the one leg stand test, appellant swayed, hopped to regain balance, lost his balance and put down his left foot three times during the test.[8]  And during the finger to nose

---

"objective symptoms" of intoxication noted by Deputy Treadway and the agency's conclusion broadly stated: "Based on the preceding it is determined that the preponderance of evidence in this case supports that [appellant] was driving a motor vehicle at the time that the concentration of alcohol in his blood was at or above 0.08%."  There is no indication that the DMV disregarded Deputy Treadway's observations in reaching its conclusion that appellant was driving with a BAC of 0.08 percent or greater.  Contrary to appellant's arguments, there is no indication that the trial court misinterpreted the DMV decision.

[7]     As the *Coffey* court noted, the "'"walk-and-turn test"' is significant because it tests "'many of the same skills needed for driving," such as small muscle control, information processing, reaction, balance, coordination, and short-term memory.'" (*Coffey, supra*, 60 Cal.4th at p. 1203, fn. 3.)  Research shows that if a suspect performs poorly on this test, "'the suspect's BAC is likely to be above 0.10 [percent].'" (*Ibid.*)

[8]     As the *Coffey* court noted, "'research shows that,'" when the suspect shows two or more clues during the one-leg stand test

tests, appellant touched his upper lip instead of his nose four out of six times.  Finally, appellant admitted to drinking two 20-ounce beers before driving.  Deputy Treadway's testimony provided substantial evidence corroborating the four results of the breath tests.

The testimony of senior criminalist Apodaca also supported the trial court's conclusion.  Apodaca gave his opinion that appellant was driving with a BAC of approximately 0.19 percent to 0.21 percent.  He supported his opinion with analysis of the timing and results of the four chemical breath tests, as well as appellant's own testimony that he had stopped drinking at 9:00 p.m.  Apodaca explained that alcohol level tends to peak somewhere between zero to 90 minutes after drinking, but then begins to fall.  After an individual has reached his or her peak, the level of alcohol in the individual's system will decrease by 0.02 percent every hour.  Apodaca opined that because appellant stated his last drink was at 9:00 p.m., by 12:45 a.m. when he was stopped, he was likely already eliminating the alcohol.  The trial court was entitled to credit the testimony of Apodaca, as did the agency.  (*Fukuda, supra*, 20 Cal.4th at p. 819 [pointing out that the Government Code "directs trial courts to give 'great weight' to credibility determinations of state agency hearing officers," even under the independent review standard].)

The substantial evidence described above supports the trial court's conclusion that the weight of the evidence formed the basis for the DMV's decision.  (*Morgenstern, supra*, 111 Cal.App.4th at p. 372.)

---

such as swaying, putting one foot down, or hopping, "'it is likely that the BAC is above 0.10 [percent].'" (*Coffey, supra*, 60 Cal.4th at p. 1203, fn. 4).

## IV.  Expert Testimony

Appellant contends that neither the testimony of Apodaca nor the testimony of Deputy Treadway was reliable evidence of appellant's BAC.  In short, appellant argues that the testimony of his expert, Okorocha, was reliable and credible, while that of the DMV's expert, Apodaca, was not.  Appellant is essentially asking us to make a credibility determination, substituting our judgment for that of the trial court—which we are not permitted to do.  (*Daly v. Wallace* (1965) 234 Cal.App.2d 689, 692 (*Daly*).)  We may only reject the testimony of a witness who has been believed by the trial court if there is a "physical impossibility" that the witness's testimony is true, or the testimony is blatantly false "without resorting to inferences or deductions."  (*Ibid.*)  "'*Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge* or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'"  (*Ibid.*)  These rules apply to expert witnesses as well as lay witnesses.  (*Id.* at p. 693.)

Appellant argues that Okorocha's testimony met the three-part test set forth in *County Sanitation Dist. v. Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1277, required to establish the reliability of an expert's opinion.  The three parts of the test require that the matter "'be perceived by or personally known to the witness or must be made known to him at or before the hearing at which the opinion is expressed[;] of a type that reasonably may be relied upon by experts in forming an opinion upon the subject to which his testimony relates[; and] may not [be based] upon any matter that is declared by the constitutional, statutory, or decisional law of this State to be an improper basis for an opinion.'"  (*Ibid.*)  Further, appellant argues, there was no

23

basis to detract from Okorocha's testimony. However, both the DMV hearing officer and the trial court clearly set forth their reasons for finding Okorocha's testimony to be inconsistent and lacking credibility.[9] We are not permitted to address issues of credibility. (*Daly, supra*, 234 Cal.App.2d at p. 692.) Appellant provides no authority suggesting that we may properly consider his argument that the trial court erred in giving Okorocha's testimony little weight.

Appellant also argues that Apodaca's testimony should not have been given any weight, arguing that Apodaca tacitly agreed with Okorocha's decision to disregard appellant's own reporting of his drinking pattern; claimed no training regarding PAS devices; provided an illogical response to a hypothetical; and feigned knowledge of any research that establishes inaccurate readings in breath testing devices during the absorption phase. For the same reason we may not address the court's credibility determinations regarding Okorocha, we may not address its credibility determinations regarding Apodaca.

---

[9] As set forth in detail above, the trial court found Okorocha's testimony to lack credibility because it was based on "an incorrect understanding of the underlying facts." In addition, the trial court noted that Okorocha's testimony did not "account for different test devices." The DMV hearing officer also pointed to Okorocha's apparent misunderstanding of the underlying facts, and noted that Okorocha testified inconsistently regarding how long it takes for an individual to fully absorb alcohol after he stops drinking.

24

The trial court's decision on the petition for writ of mandate is supported by substantial evidence.

## DISPOSITION

The judgment is affirmed. Real party in interest is awarded its costs of appeal.

_____
CHAVEZ, Acting P. J.

We concur:


_____
HOFFSTADT, J.


_____
BENKE, J.*

\*      Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.